## In re REPUBLIC GAS CORPORATION.

District Court, S. D. New York.

June 10, 1936.

W. Randolph Montgomery, Trustee.

Mudge, Stern, Williams & Tucker, of New York City (Joseph V. Kline, of New York City, of counsel), for American Nat. Bank, City Nat. Bank, and National Bank of Commerce, bondholders.

White & Case, of New York City (Joseph M. Hartfield and Ernest G. Fifield, both of New York City, of counsel), for Bondholders Protective Committee.

Cravath, deGersdorff, Swaine & Wood, of New York City (Donald C. Swatland, of New York City, of counsel), for Continental Supply Co.

Fred W. Moore, of Houston, Tex. (L. F. Huttenlocher, of New York City, of counsel), for R. Wayne Lawler, receiver of Moody Seagrave Co.

Chadbourne, Stanchfield & Levy, of New York City (C. B. Hughes and David S. Hecht, both of New York City, of counsel), for Manufacturers Trust Co., Trustee of Bonds of the Debtor Corporation.

Scudder, McCoun, Stockton & Kerfoot, of New York City (Branch P. Kerfoot, of New York City, of counsel), for debtor.

L. W. Lougee, of New York City, for Empire Power Corporation.

Vinson, Elkins, Sweeton & Weems, of Houston, Tex. (Lewis N. White, of Houston, Tex., of counsel), for Republic Natural Gas Co., successor in interest to the debtor herein.

Clarence E. Lott, of Phoenix, Ariz., for First Nat. Bank of Negaunee, Mich., a bondholder, and for several other banks in the Upper Peninsula of Michigan, and also for some bondholders in the Upper Peninsula of Michigan.

Ben A. Matthews, of New York City, Special Master.

CAFFEY, District Judge.

A bondholders protective committee asks compensation of $50,000 and a reorganization committee, compensation of $20,000. Approval of disbursements, heretofore made or remaining unpaid, is also requested. I shall deal first with the compensation applications.

A hearing on numerous applications, including those of the committees, was held in August, 1935 (Minutes, pp. 527–827). I disposed of most of those in eight memoranda. The last memorandum was dated November 29, 1935. By early December I was nearly ready to pass on the committee applications. I then became engrossed in other court work which had precedence. Work of that kind has occupied all my time ever since. On that account I have been unable until recently again to take up the committee applications. I regret the delay, but it has been unavoidable. I have not had opportunity earlier to complete the requisite investigation of the law or to give the matter the consideration which its importance deserved.

There are five members of the bondholders committee and three of the reorganization committee. Pursuant to the deposit agreement, the latter committee was selected by the former. The chairman and another applicant are members of both committees. In consequence, there are only six petitioners.

It will be convenient to refer to the petitioners by numbers. The chairman of both committees will be called No. 1; the other member of both committees, No. 2; the New York member of the bondholders committee, No. 3; one Philadelphia member of that committee, who will be further identified hereafter, No. 4; another Philadelphia member of the same committee, No. 5; and the member of the reorganization committee who did not belong to the bondholders committee, No. 6.

The bondholders committee was organized and the deposit agreement executed in January, 1932. In September, 1933, the debtor filed a bankruptcy petition in Dela-

ware. Thereafter a suit was instituted in this court to foreclose a trust indenture under which substantially all property of the debtor (consisting of bonds and stock) was pledged. The two proceedings were steps in a single program and were commenced at the instance of or with the acquiescence of the committee. The purpose was to bring about a reorganization.

All members of the bondholders committee were the heads of or associated with houses which originally distributed to the public bonds and stock of the debtor involved in this proceeding (pp. 653, 654, 689, 693, 694, 705, 731, 732, 733, 750, 751, 752.) No. 6, who is on the reorganization committee alone, was the representative of a large unsecured supply creditor, who also held bonds of the debtor (pp. 655, 683, 687).

Upwards of 78% of the bonds were deposited with the bondholders committee. In connection with the reorganization plan additional bonds came into their hands. The committee filed in this court consents to the plan by holders of more than 92% of the bonds. The deposit agreement, which is lengthy and in the conventional form prevailing at the time, conferred on the committee comprehensive powers, including authority to take the various steps looking to a reorganization of the debtor and to fix their own compensation.

The foreclosure suit had approached the point of readiness to be submitted for a final decree when the passage of Section 77B of the Bankruptcy Act 11 U.S.C.A. § 207, seemed imminent. Accordingly, the foreclosure case was held in abeyance. About that time the reorganization committee was selected. Promptly after Section 77B went into effect the committees caused reorganization proceedings under the new statute to be begun in Delaware and procured their transfer to this court.

While serving on one or both committees four members had transactions in bonds of the debtor. No. 1, No. 2 and No. 3 bought and sold and No. 4 bought bonds. No. 5 and No. 6 neither bought nor sold.

No. 1 bought $100,000 of the bonds at prices ranging from 7 or 7½ to 38 and averaging about 15. He sold either $85,500 or $86,000 of these, at prices ranging from 23 to 37, at a profit of about $10,000. At the time of the hearing he still held either $14,000 or $14,500 of the bonds. These had been purchased at an average price of 15 and had a market price at the time of the

hearing of about 70 (pp. 775, 776). As a consequence, there had been a rise in the market value of the retained bonds of approximately 55 or of between $7,500 and $8,000 (pp. 705, 706, 719-721, 733).

No. 2 bought about $35,000 of bonds at prices ranging between 39 and 42. He sold them at prices ranging between 42 and 46. The profit was about $1,500 (p. 753).

As shown by his affidavit, No. 3 bought $45,000 of bonds at prices of 32 and 32¼, or a total of $14,450. He sold them at prices ranging from 41½ to 45¼, or a total of $19,223.75, thus taking a profit of a little over $4,700.

No. 4 bought $7,000 of bonds at prices ranging from 19¾ to 38 or 39, averaging about 30 and costing about $2,100. At the time of the hearing these, at the market price, were worth about $4,900 (pp. 672, 740–743, 748). So the increase in value, or potential profit, was then approximately $2,800.

■ This court has squarely held that "a committee member who, during his period of service, purchases and sells, or purchases, for personal gain, securities of the company which he is engaged in trying to reorganize, is not entitled to an allowance for his services as a committee member." In re Paramount-Publix Corporation, D.C., 12 F.Supp. 823, 828. If this statement of the law be adhered to, then, on the facts, it is indisputable that compensation out of the trust estate must be denied to No. 1, No. 2, No. 3 and No. 4.

So long as the Paramount decision stands, as it now stands, unreversed on the point for which it is cited, I feel that it should be followed. Moreover, I think it is sustained by the best considered, and perhaps controlling, authorities.

■ The conclusion reached rests, or can be grounded, on three propositions as follows:

(1) Members of the committees at the times of their dealings in bonds of the debtor were trustees for the depositing bondholders. Bullard v. Cisco, 290 U.S. 179, 189, 54 S.Ct. 177, 78 L.Ed. 254, 93 A.L.R. 141; Habirshaw Elec. Cable Co. v. Habirshaw Elec. Cable Co. 2 Cir., 296 F. 875, 880, 881, 43 A.L.R. 1035.

■ (2) Because of the inconsistent positions which are an unavoidable incident, it is a fraud in law for a trustee to purchase property which is the subject matter of his trust and the making of such a purchase is misconduct. Michoud v. Girod, 4 How. 503, 553, 554, 555, 557, 559, 11 L.Ed. 1076. See, also, Wormley v. Wormley, 8 Wheat. 421, 441, 5 L.Ed. 651; Hoyt v. Latham, 143 U.S. 553, 566, 12 S. Ct. 568, 36 L.Ed. 259; Cowee v. Cornell, 75 N.Y. 91, 100, 31 Am.Rep. 428; Pyle v. Pyle, 137 App.Div. 568, 572, 122 N.Y.S. 256, affirmed 199 N.Y. 538, 92 N.E. 1099.

■ (3) The commission by a trustee of a fraud on his cestuis que trustent, or other misconduct by him equivalent to a fraud in the management of the trust estate, justifies his being deprived, and in some instances requires that he be deprived, of compensation. In re Polansky, D.C., 41 F.Supp. 547, and cases cited. See also Lewis v. Ingram, 10 Cir., 57 F.2d 463, 465. This is true even where the fraud is merely constructive. Flagg v. Mann, 9 Fed.Cas. 231, at page 235, No. 4848.

■ It may be suggested, and in effect is argued, that the committeemen were trustees only for depositors, that their purchases were from non-depositors and that hence there was no violation of any right of the depositors. Let it be assumed that the facts are as just recited. Nevertheless, I am impressed that the conclusion sought to be drawn is a non sequitur. I feel that the fact that the sellers were not depositors would not exempt committeemen-purchasers from the rule arising out of the three propositions above stated.

■ As I see it, the evil from purchasing non-deposited bonds impinges upon the reason for the rule precisely as would purchasing from a depositor. The prohibition against dealing in bonds of an issue of which a portion—perhaps more particularly when an overwhelmingly large proportion, enough to carry with it complete dominance of the situation—is being handled by a committee grows out of the requirement that a trustee have no interest, or even temptation, to act adversely to the beneficiaries of his trust. Trafficking in any bonds of the issue would or might beget a desire to buy low or to sell high. The confidence reposed by depositors, as a body, in their trustee would be abused by such behavior on his part in like fashion and to the same extent, irrespective of whether the bonds dealt in were owned by a depositor or by a non-depositor.

■ It has been urged that the purchases by the four committee members concerned were made in the open market

304

and, therefore, were warranted. Cf. Goodwin v. Agassiz, 283 Mass. 358, 186 N.E. 659, 661. I fail to see, however, how, under the circumstances here, the place or source of purchase makes a difference. Indeed, it strikes me that the contention is, in effect, identical with that already mentioned; that is, with the contention that a committeeman merits no criticism by buying from a non-depositor.

■ In Michoud v. Girod, supra, 4 How. at page 557, 11 L.Ed. 1076, it was said that condemnation of a trustee purchasing property which is the subject of his trust is applicable where the sale is "at public auction, bona fide, and for a fair price." It seems to me that this equally covers purchases on an exchange. This is true because purchases on an exchange of bonds of the precise kind and issue as the bonds held by a committee as trustee for depositors carries with it the same "temptation to abuse" and "danger of imposition inaccessible to the * * * court" as would exist if the purchases had been made directly from depositors. Id., 4 How. at page 557, 11 L.Ed. 1076.

Moreover, though I lay no stress on it, another fact may be worthy of note. In the usual way, the bondholders committee designated a trust company as depositary for the bonds. The company issued certificates of deposit to all depositors. These certificates of deposit were actively traded in. There is no showing as to whether what the committeemen bought were actually bonds or certificates of deposit. It may well be, therefore, that they acquired the latter. If so, it would seem that really they were purchasers from depositors.

■ The debtor was a holding company. Its assets of any substantial value—though indirectly owned—consisted of property of subsidiaries which it controlled. Through the position attained by the bondholders committee, by means of the deposit agreement, for several years they dominated the debtor and the subsidiaries. Committee members were elected to the directorates of the debtor and most of the subsidiaries. Some also became officers of those subsidiaries (pp. 668, 692, 733, 735). Irrespective of, and without disparagement of, the character of services they performed in the conduct of the debtor and the subsidiaries, by the course they adopted they assumed a place in the entire set-up which, as I think, necessarily carried with it an unqualified duty to avoid any attempt at personal gain by trading in the bonds.

The deposit agreement was plainly designed to vest in the bondholders committee the control which, in practice, they exercised. By the deposit with them first of 78% and later of 92% of the bonds they obtained control of the financial fate of all bondholders, whether depositors or non-depositors, preceding reorganization, as well as throughout the reorganization itself, subject, of course, to court approval of the plan. Otherwise put, it is impossible to separate the effect on non-depositors from the effect on depositors or vice versa. The two stand together.

■ There is no blinking the fact that the ground on which the court denounces as a fraud the purchase by a trustee of trust property is that it inevitably brings about conflict of interest between himself personally and the beneficiaries of his trust; or at least that it incites a motive, or affords opportunity for a motive, on the part of the trustee to take advantage of his superior knowledge acquired in his trust capacity, which may induce him to conceal his information from the beneficiaries or not to employ it exclusively for their benefit, while they are relying on him scrupulously to devote himself to the furtherance of their welfare. Michoud v. Girod, supra, 4 How. pages 554, 555, 559, 11 L.Ed. 1076.

Counsel for the committeemen cite a group of cases in the State courts having to do with the responsibility of directors to stockholders concerning their individual holdings of shares of stock. Goodwin v. Agassiz, 283 Mass. 358, 186 N.E. 659; Poole v. Camden, 79 W.Va. 310, 92 S.E. 454, L.R.A.1917E, 988; Dawson v. National Life Ins. Co., 176 Iowa 362, 157 N.W. 929, L.R.A.1916E, 878, Ann.Cas. 1918B, 230. Without undertaking to determine whether that group or another group which looks the other way (for example, Oliver v. Oliver, 118 Ga. 362, 45 S. E. 232; Stewart v. Harris, 69 Kan. 498, 77 P. 277, 66 L.R.A. 261, 105 Am.St.Rep. 178, 2 Ann.Cas. 873) is to be preferred, I think it is enough to point out that the decisions relied on by the committeemen are clearly distinguishable from, and cannot be taken as weakening, the three classes of decisions previously assembled in this memorandum to support the holding in the Paramount case. If the latter do sustain the Paramount case, then obviously the State

court decisions here under discussion should not be followed.

■ Again, it is said that the committeemen gained exemption from blame by a clause in the deposit agreement which permitted them to be or to become pecuniarily interested in property which was the subject of the agreement. This may have been so prior to the passage of Section 77B (Habirshaw case, supra, 296 F. at pages 879, 880, 43 A.L.R. 1035); but I think that the last proviso of subdivision b, empowering the court to disregard the provisions of such an agreement, if unfair, has destroyed the defense invoked. Moreover, viewing the section as an entirety, I think it would fail of its beneficent purposes unless committees were held to the high degree of duty imposed by the announcement heretofore quoted from the Paramount case. I believe that only by rigid enforcement of that duty can the continuance or reinstatement of old evils, which were of general knowledge, be prevented or, if prevention prove impossible, be minimized.

■ It is insisted, particularly because the reorganization in the present instance is a success, that if the court feels compelled to frown on transactions such as those under review, it would be enough if from the fair value of the services of the committeemen there were a deduction of their gains from purchases and sales or from purchases where they still hold the bonds they bought (pp. 773, 774). As I see it, however, in circumstances like those in a reorganization, yielding to this insistence would result in a rule which, as a practical matter, would be unenforcible. Furthermore, if, as I deem it established, the misconduct amounts to a fraud in law, I conceive of no good reason why the penalty for the fraud should not be denial of any compensation whatever for those services. Indeed, I feel that the only available device for promoting, if not assuring, justice to depositing bondholders in the management of their affairs, and thus of restoring or attempting to restore faith in deposit agreements, is strict application to committeemen of the ancient equity rules governing the conduct of trustees, including deprivation of compensation where there is a departure from those rules.

It is said that it is desirable that able and experienced men serve on committees; also that if they are to take the risk of working for nothing, they will refuse to serve. In the present instance the evidence indicates that the committeemen—because they or their organizations had marketed and because of the methods they employed in marketing the securities—owed the investors the duty to do what they could to salvage something for those who, at the solicitation and upon the representations of the committeemen or their associates, had put money into the enterprise. However that may be, it is clear that the committeemen procured their own appointment on the bondholders committee. They were volunteers. In consequence, their case for payment is not so strong as if they had been sought out or had been invited by the bondholders to represent them. Even so, I agree that it is beneficial to the bondholders to have well qualified agents to act for them in any complicated reorganization. I agree likewise that the courts should do nothing, which is avoidable, that will discourage the best type of men from undertaking committee service. On the other hand, I do not feel that the penalty of no remuneration as a part of the prohibition against having interests conflicting with those of the bondholders should constitute a deterrent to such men.

■ At the hearing No. 4 urged that his purchases were for investment and were part of an effort to recoup losses on his stock. The implication is that, because he still retains the purchased bonds, a distinction in treatment should be made between him and those who sold as well as bought.

I am unable to adopt the reasoning on which the attempted differentiation is predicated. On the contrary, I feel that the rule on which the holding in the Paramount case is based was created in equity so that, as nearly as possible, the violation of trust obligations can be obviated or at least discouraged; that, therefore, the purchase by a committeeman for gain, whether in the open market or otherwise, is as much to be safeguarded against as a purchase and sale.

I recognize that hard work has been done and ability has been displayed by the committeemen. In these circumstances it is unfortunate for those who traded in the bonds to be left without remuneration for their services. Nevertheless, unless and until an appellate court otherwise direct, I feel impelled rigidly to apply the rule of law which seems to me, on principle as well as on the authorities, plainly to govern.

It is true that the profits of committeemen dealing in bonds varied and that some were quite small. I have reflected on whether there should be apportionment of the penalties inflicted. I have been unable, however, to escape the feeling that an attempt to withhold payment in accord only with the degree of blame would destroy the rule.

At the August, 1935, hearing opposition to the allowances sought by these committeemen was expressed on further grounds (pp. 691, 695–702, 712, 718, 721, 722, 728, 729, 732, 736, 746, 754, 767, 770, 771). I have preferred, however, to base my action on the single ground which I have assigned.

At the expense of repetition, but by way of emphasis, I summarize my views as follows:

Under the law as it formerly stood (Habirshaw case, supra), the court was practically compelled to acquiesce in committee decisions. Subdivision b of Section 77B authorizes the court to nullify unfair provisions of deposit agreements. As a concomitant, subdivision c (9) specifically vests in the court authority, without embarrassment from deposit agreements, to determine what allowances shall be made to the members of committees. It is an advantage to bondholders to have competent committee members participate in complicated reorganization cases. Ordinarily it is impossible to get men of that type to accept places on such committees unless they be reasonably paid. On the other hand, if the best services are to be procured, it is essential that they be rendered in a wholly disinterested way. It may well be that there are some who, without veering away from the utmost faithfulness, could safely be left free to trade in bonds which are the subject matter of their trusts. Nevertheless, the danger of the contrary is so manifest, the bondholders themselves generally are so helpless and the hurt to them is or may be so serious that, in order to protect against the evil, or the possibility of the evil, from which bondholders have suffered so grievously in the past, and which Congress intended to bring to an end, the court should inflexibly enforce the rule that members of committees shall not trade in the securities with respect to which they are acting or undertaking to act in behalf of the owners.

It is perhaps unnecessary to add, but out of abundance of caution I wish to add, that nothing I have said is intended in any way to reflect on the personal integrity of those who have been denied compensation.

I see no occasion for construing subdivision i of Section 77B, about which there was discussion at the hearing (pp. 763–765, 771). The power with respect to administration expenses in prior proceedings there dealt with need not be employed here. I think that subdivision c sufficiently defines the authority which must be exercised in passing on the applications of No. 5 and No. 6. Neither bought or sold bonds during the period of his service on a committee. An allowance of $6,000 will be made to No. 5 and of $3,500 to No. 6. Bearing in mind the admonition of the appellate courts that there must be moderation in matters of this kind, upon the proof I regard those amounts as fair.

I turn now to the subject of disbursements.

The disbursements of the bondholders committee are set out in Exhibit B to its petition verified July 9, 1935. For some of these (already paid) it seeks approval and for others (incurred but not paid) it seeks a direction that the reorganized corporation (Republic Natural Gas Company) pay them.

The disbursements of the reorganization committee are set out in Exhibit B to its petition verified the same date. Only three amounts are mentioned. Under a recent order two of these (covering printing bills) have been paid and the committee desires that the new company be instructed to pay the third.

The following items in Exhibit B to the petition of the bondholders committee are approved: $4,013.01; $3.90; $12.77 (under the heading of advertising and publicity); $4,397.93; $125 (under the heading of legal expenses); $500; $8,375; $1,586.50; $277.17 and $270.06 (under the heading of committee members' expenses, etc. On the evidence before me I am not prepared to pass finally on the other items of either petition. Decision on them is reserved.

By supplemental petition verified August 21, 1935, the bondholders committee asked that the new company be required to meet another bill which, by oversight, was omitted from its original petition. Because the information in hand about this item is insufficient, decision on it is reserved.

The new company has examined the supporting vouchers supplied by both committees. Under date of October 12, 1935, it made a report. In this attention was called to minor deductions which should be made because of errors, additional items presented to it by committeemen were scheduled and expenses of reorganization of the debtor borne by subsidiaries are set out. Apparently also it fails to reconcile the bank balance of the bondholders committee, stated by its secretary (as of June 15, 1935) in his affidavit verified August 5, 1935, to be $2,806.96. Without further explanation, and possibly without further proof, it would be impossible justly to pass on the matters mentioned. Decision on them is reserved.

I am reluctant to send the accounting to a master. I have spent a good deal of time on it. I think it probable that, because of my familiarity with the problem, I could dispose of it more quickly than a master. It is quite likely that if interested counsel were assembled, they could give me all or most of the information I need or, if it be somewhere in the voluminous record and I have overlooked it, call my attention to it.

I suggest, therefore, that, on notice to counsel for the Republic Natural Gas Company and at a time convenient for him, a hearing be arranged on the reserved items, without the attendance of witnesses. If at the hearing I am not fully satisfied, then opportunity to supplement the proof will be afforded or the undisposed of part of the accounting will be sent to a master.

Settle order in accordance with the foregoing on three days' notice.