## SMOLOWE et al. v. DELENDO CORPORATION et al.

### No. 191.

Circuit Court of Appeals, Second Circuit.

June 8, 1943.

Jack Hart, of New York City (Arthur J. Sleppin, of New York City, on the brief, for Smolowe, and Samuel A. Mehlman, of New York City, on the brief, for Levy), for plaintiffs-appellees.

Jay Leo Rothschild, of New York City (Louis Rivkin, of New York City, on the brief), for defendants-appellants.

Chester T. Lane, Sp. Asst. to Atty. Gen. (Mathias F. Correa, U. S. Atty., and William L. Lynch, Asst. U. S. Atty., both of New York City, Francis M. Shea, Asst. Atty. Gen., Sidney J. Kaplan, Sp. Asst. to Atty. Gen., and Donald R. Seawell, of Washington, D. C., and John F. Davis, Sol., Milton V. Freeman, Asst. Sol., Milton P. Kroll, and W. Victor Rodin, Securities and Exchange Commission, all of Philadelphia, Pa., on the brief), for United States, intervenor-appellee.

Before SWAN, CHASE, and CLARK, Circuit Judges.

CLARK, Circuit Judge.

The issue on appeal is solely one of the construction and constitutionality of § 16(b) of the Securities Exchange Act of 1934, 15 U.S.C.A. § 78p(b), rendering directors, officers, and principal stockholders liable to their corporation for profits realized from security tradings within any six months' period. Plaintiffs, Smolowe and Levy, stockholders of the Delendo Corporation, brought separate actions under this statute on behalf of themselves and other stockholders for recovery by the Corporation—joined as defendant—against defendants Seskis and Kaplan, both directors and president and vice-president respectively of the Corporation. The United States, upon notification that the constitutionality of a federal statute had been called in question, sought intervention, which was granted, 36 F.Supp. 790; and thereafter the two actions were consolidated. After trial at which the facts were stipulated, the district court in a careful opinion, 46 F.Supp. 758, held the named defendants liable for the maximum profit shown by matching their purchases and sales of corporate stock, some transacted privately and some upon a national securities exchange, between December 1, 1939, and May 30, 1940, in conceded good faith and without any "unfair" use of inside information.

The named defendants had been connected with the Corporation (whose name was Oldetyme Distillers Corporation until after the transactions here involved) since 1933, and each owned around 12 per cent (approximately 100,000 shares) of the 800,000 shares of $1 par value stock issued by the Corporation and listed on the New York Curb Exchange. The Corporation had negotiated for a sale of all its assets to Schenley Distillers Corporation in 1935-1936; but the negotiations were then terminated because of Delendo's contingent liability for a tax claim of the United States against a corporation acquired by it, then in litigation. This claim, originally in the amount of $3,600,000, had been reduced by agreement to $487,265, with the condition that trial was to be postponed (to await the trial of other cases) until, but not later than, December 31, 1939. The Corporation was, therefore, pressing for trial when on February 29, 1940, the present attorney for the defendants submitted to the Attorney General a formal offer of settlement of $65,000, which was accepted April 2 and publicly announced April 5, 1940. Negotiations with Schenley's were reopened on April 11 and were consummated by sale on April 30, 1940, for $4,000,000, plus the assumption of certain of the Corporation's liabilities. Proceedings for dissolution of the Corporation were thereupon initiated and on July 16, 1940, an initial liquidating dividend of $4.35 was paid.

During the six months here in question from December 1, 1939, to May 30, 1940, Seskis purchased 15,504 shares for $25,150.20 and sold 15,800 shares for $35,550, while Kaplan purchased 22,900 shares for $48,172 and sold 21,700 shares for $53,405.16. Seskis purchased 584 shares on the Curb Exchange and the rest from a corporation; he made the sale at one time thereafter to Kaplan at $2.25 per share—15,583 shares in purported satisfaction of a loan made him by Kaplan in 1936 and 217 shares for cash. Kaplan's purchases, in addition to the stock received from Seskis, were made on the Curb Exchange at various times prior to April 11, 1940; he sold 200 shares on February 15, and the remaining shares between April 16 and May 14, 1940 (both to private individuals and through brokers on the Curb). Except as to 1,700 shares, the certificates delivered by each of them upon selling were not the same certificates received by them on purchases during the period. The district court held the transactions within the statute and by matching purchases and sales to show the highest profits held Seskis for $9,733.80 and Kaplan for $9,161.05 to be paid to the Corporation. Both the named defendants and the Corporation have appealed.

Section 16(b) of the Securities Exchange Act of 1934 provides: "For the purpose of preventing the unfair use of information which may have been obtained by such beneficial owner, director, or officer by reason of his relationship to the issuer, any profit realized by him from any purchase and sale, or any sale and purchase, of any equity security of such issuer (other than an exempted security) within any period of less than six months, unless such security was acquired in good faith in connection with a debt previously contracted, shall inure to and be recoverable by the issuer, irrespective of any intention on the part of such beneficial owner, director, or officer in entering into such transaction of holding the security purchased or of not repurchasing the security sold for a period exceeding six months. Suit to recover such

profit may be instituted at law or in equity in any court of competent jurisdiction by the issuer, or by the owner of any security of the issuer in the name and in behalf of the issuer if the issuer shall fail or refuse to bring such suit within sixty days after request or shall fail diligently to prosecute the same thereafter; but no such suit shall be brought more than two years after the date such profit was realized. This subsection shall not be construed to cover any transaction where such beneficial owner was not such both at the time of the purchase and sale, or the sale and purchase, of the security involved, or any transaction or transactions which the Commission by rules and regulations may exempt as not comprehended within the purpose of this subsection."

■ The controversy as to the construction of the statute involves both the matter of substantive liability and the method of computing "such profit." The first turns primarily upon the preamble, viz., "For the purpose of preventing the unfair use of information which may have been obtained by such beneficial owner, director, or officer by reason of his relationship to the issuer." Defendants would make it the controlling grant and limitation of authority of the entire section, and liability would result only for profits from a proved unfair use of inside information. We cannot agree with this interpretation.

We look first to the background of the statute. Prior to the passage of the Securities Exchange Act, speculation by insiders—directors, officers, and principal stockholders—in the securities of their corporation was a widely condemned evil.[1] While some economic justification was claimed for this type of speculation in that it increased the ability of the market to discount future events or trends, the insiders' failure to disclose all pertinent information gave them an unfair advantage of the general body of stockholders which was not to be condoned. Twentieth Cen-

tury Fund, Inc., The Security Market, 1935, 297, 298. By the majority rule, aggrieved stockholders had no right to recover from the insider in such a situation. And although some few courts enforced a fiduciary relationship and the United States Supreme Court in Strong v. Repide, 213 U.S. 419, 29 S.Ct. 521, 53 L.Ed. 853, announced a special-circumstances doctrine whereby recovery would be permitted if all the circumstances indicated that the insider had taken an inequitable advantage of a stockholder, even these remedies were inadequate because of the heavy burden of proof imposed upon the stockholders.[2]

■ The primary purpose of the Securities Exchange Act—as the declaration of policy in § 2, 15 U.S.C.A. § 78b, makes plain—was to insure a fair and honest market, that is, one which would reflect an evaluation of securities in the light of all available and pertinent data. Furthermore, the Congressional hearings indicate that § 16(b), specifically, was designed to protect the "outside" stockholders against at least short-swing speculation by insiders with advance information.[3] It is apparent too, from the language of § 16(b) itself, as well as from the Congressional hearings, that the only remedy which its framers deemed effective for this reform was the imposition of a liability based upon an objective measure of proof. This is graphically stated in the testimony of Mr. Corcoran, chief spokesman for the draftsmen and proponents of the Act, in Hearings before the Committee on Banking and Currency on S. 84, 72d Cong., 2d Sess., and S. 56 and S. 97, 73d Cong., 1st and 2d Sess., 1934, 6557: "You hold the director, irrespective of any intention or expectation to sell the security within six months after, because it will be absolutely impossible to prove the existence of such intention or expectation, and you have to have this crude rule of thumb, because you cannot undertake the burden of having to prove

---

[1] See Hearings before Committee on Banking and Currency on S. 84, 72d Cong., 2d Sess., and S. 56 and S. 97, 73d Cong., 1st and 2d Sess., 1934; Tracy and MacChesney, The Securities Exchange Act of 1934, 32 Mich.L.Rev. 1025, 1032; Comment, 32 Mich.L.Rev. 678.

[2] See Yourd, Trading in Securities by Directors, Officers and Stockholders: Section 16 of the Securities Exchange Act, 38 Mich.L.Rev. 133, 139; Lake, The Use

for Personal Profit of Knowledge Gained While a Director, 9 Miss.L.J. 427, 443.

[3] See Hearings before Committee on Interstate and Foreign Commerce on H. R. 7852 and H. R. 8720, 73d Cong., 2d Sess., 1934, 85; Hearings before Committee on Banking and Currency on S. 84, 72d Cong., 2d Sess., and S. 56 and S. 97, 73d Cong., 1st and 2d Sess., 1934, 6557–6559.

that the director intended, at the time he bought, to get out on a short swing."[4]

A subjective standard of proof, requiring a showing of an actual unfair use of inside information, would render senseless the provisions of the legislation limiting the liability period to six months, making an intention to profit during that period immaterial, and exempting transactions wherein there is a bona fide acquisition of stock in connection with a previously contracted debt. It would also torture the conditional "may" in the preamble into a conclusive "shall have" or "has." And its total effect would be to render the statute little more of an incentive to insiders to refrain from profiteering at the expense of the outside stockholder than are the common-law rules of liability; it would impose a more stringent statute of limitation upon the party aggrieved at the same time that it allowed the wrongdoer to share in the spoils of recovery.[5]

Had Congress intended that only profits from an actual misuse of inside information should be recoverable, it would have been simple enough to say so. Significantly, however, it makes recoverable the profit from any purchase and sale, or sale and purchase, within the period. The failure to limit the recovery to profits gained from misuse of information justifies the conclusion that the preamble was inserted for other purposes than as a restriction on the scope of the Act.[6] The legislative custom to insert declarations of purpose as an aid to constitutionality is well known. Moreover, the preamble here serves the desirable purpose of guide to the Commission in the latter's exercise of its rule-making authority.

True, early drafts of the statute were without this preamble.[7] But there is no indication, either in the Congressional hearings or in the debates, of dissent from the proposed objective standard of proof. Had the statute as enacted imposed more stringent penalties than appeared in these early drafts, there might be more reason for supposing that the introduction of a subjective standard was intended. But the statute as enacted actually omitted draft provisions rendering long and short sales by corporate fiduciaries within any six months' period unlawful and subject to criminal penalties.[8] Furthermore, provisions in these early drafts declaring unlawful the improper disclosure of confidential information regarding securities by directors, officers, or principal stockholders, and holding that any profit made by any person to whom such unlawful disclosure was made should inure to the corporate issuer, were deleted, presumably because the burden of proof made enforcement unfeasible.[9] Anomalously the construction of the statute which defendants would have us adopt would impose an equally severe burden as to profits made by the insiders themselves.

The present case would seem to be of the type which the statute was designed to include. Here it is conceded that the defendants did not make unfair use of information they possessed as officers at the time of the transactions. When these began they had no offer from Schenley's. But they knew they were pressing the tax suit; and they, of course, knew of the corporate offer to settle it which re-established the offer to purchase and led to the favorable sale. It is naive to suppose that their knowledge of their own plans as officers did not give them most valuable inside knowledge as to what would probably happen to the stock in which they were dealing. It is difficult to find this use "unfair" in the sense of illegal; it is certainly an advantage and a temptation within the

---

[4] Yourd, supra note 2, at 134, n. 2: "Until legal action or Congressional investigation brings the facts to light one cannot always determine who of the insiders falls into which class. Sometimes those thought to be most exemplary in conduct turn out to be the ones who have taken greatest undue advantage of a trust."

[5] Cf. Yourd, supra note 2, at 150, 151.

[6] Cf. Otis & Co. v. Insurance Bldg. Corp., 1 Cir., 110 F.2d 333.

[7] H. R. 7852, H. R. 7855, H. R. 8720, H. R. 9323, S. 2693.

[8] H. R. 7852 and S. 2693, which were identical in all their provisions, and which were extensively aired at public hearings, imposed such penalties. H. R. 8720, the only other bill upon which public hearings were held, imposed the same civil penalties as the instant statute. See Yourd, supra note 2, at 151, n. 60.

[9] See Hearings before Committee on Interstate and Foreign Commerce on H. R. 7852 and H. R. 8720, op. cit. supra note 3, at 135, 136, 137; Hearings before Committee on Banking and Currency on S. 84, op. cit. supra note 1, at 6555.

general scope of the legislature's intended prohibition.

The legislative history of the statute is perhaps more significant upon a determination of the method of computing profits—defendants' second line of attack upon the district court's construction of the statute. They urge that even if the statute be not construed to impose liability only for unfair use of inside information, in any event profits should be computed according to the established income tax rule which first looks to the identification of the stock certificate, and if that is not established, then applies the presumption which is hardly more than a rule of administrative convenience of "first in, first out."[10] Defendants rely on the deletion from early drafts of the statute, H.R. 7852, H.R. 8720, and S. 2693, of a provision that profit should be calculated irrespective of certificates received or delivered.[11] H.R. 9323, which was finally passed by the House, failed even to penalize short-swing speculations, other than to prohibit short sales. But H. R. 8720 was never discussed by a House Committee of the Whole, and the omission of the penalty provision in H.R. 9323 suggests at most only an opinion of the Committee on Interstate and Foreign Commerce which drafted it, and one which concerns merely the advisability of any penalty, not the method for its computation.

Actually the Act as passed is a combination of H.R. 9323 and S. 3420.[12] In the process § 16(b) was taken bodily from S. 3420 and written into H.R. 9323. S. 3420 was introduced into the Senate after elaborate hearings on S. 2693 were closed. And its failure to specify a method of computation may well be thought more of a sanction of the formula devised in S. 2693 than an expression of hostility towards it.

Such a conclusion may be reached upon the face of the Act. "Purchase" is defined in § 3(a) (13), 15 U.S.C.A. § 78c (a) (13), to include "any contract to buy," and "sale," in § 3(a) (14), to include "any contract to sell." "Equity security" is defined in § 3(a) (11) as "any stock or similar security." Section 16(b) then appears simply as a statement that any profit from any contract to purchase and any contract to sell—or vice versa—any stock or similar security shall be recoverable by the corporate issuer.[13] There is no express limitation in this language; its generality permits and points to the matching of purchases and sales followed below. The fact that purchases and sales may be thus coupled, regardless of the intent of the insider with respect to a particular purchase or a particular sale and without limitation to a specific stock certificate, points to an arbitrary matching to achieve the showing of a maximum profit. Thus, where an insider purchases one certificate and sells another, the purchase and sale may be connected, even though the insider contends that he is holding the purchased security for sale after six months.

Defendants seek support for their position from the Senate hearings, where, in answer to Senator Barkley's comment, "All these transactions are a matter of record. It seems to me the simple way would be to charge him with the actual profit," Mr. Corcoran responded: "It is the same provision you have in the income tax law. Unless you can prove the actual relationship between certificates, you take the highest price sold and the lowest price bought."[14] This was an incorrect statement of the income tax law. The rule there is first in, first out, regardless of price, wherever the stock actually purchased and sold is not

---

[10] See notes 15, 16, 18, below.

[11] H. R. 7852 and S. 2693 contained the provision that "profit shall be calculated on the sale or sales by such person of such security made at the highest price or prices and on the purchase or purchases made by such person of such security at the lowest price or prices during the six months' period, irrespective of the certificates for such security received or delivered by such person during such period." H. R. 8720 provided that "the profit shall be the difference between the aggregate amount for which such security was purchased and sold during the six months' period irrespective of the certificates for such security received or

delivered pursuant to such purchases and sales." See note 8, supra.

[12] 78 Cong. Rec. 9930, 9936, 10248, 10254, 10262.

[13] The statute might be read literally to permit a recovery where stock of one class is purchased and stock of another class sold. But the possibility that Congress intended such a result is beyond the realm of judicial fantasy. As will be indicated, however, there is no occasion to limit further the statutory language to the purchase and sale of the same certificates of stock of a particular class.

[14] See Hearings before Committee on Banking and Currency on S. 84, op. cit. supra note 1, at 6559.

identifiable.[15] But this does show the rule the proponents had in mind, even though its source is erroneously stated. Analysis will show that the income tax rules cannot apply without defeating the law almost completely. Under the basic rule of identifying the stock certificate, the large stockholder, who in most cases is also an officer or director, could speculate in long sales with impunity merely by reason of having a reserve of stock and upon carefully choosing his stock certificates for delivery upon his sales from this reserve. Moreover, his profits from any sale followed by a purchase would be practically untouchable, for the principle of identity admits of no gain without laboring proof of a subjective intent—always a nebulous issue—to effectuate the connected phases of this type of transaction.[16] In consequence the statute would be substantially emasculated. We cannot ascribe to it a meaning so inconsistent with its declared purpose.[17]

■ Once the principle of identity is rejected, its corollary, the first-in, first-out rule, is left at loose ends. At best it is a rule of convenience designed originally to hit marginal trading without shares in hand and supplementing the principle of identity.[18] Its rationalization is the same as that for the identification rule, for which it operates as a presumptive principle; and it has no other support. If we reject one, we reject the other and for like reasons. Its application would render the large stockholder with a backlog of stock not immediately devoted to trading immune from the Act.[19] Further, we should note that it does not fit the broad statutory language; a purchase followed immediately by a sale, albeit a transaction within the exact statutory language, would often be held immune from the statutory penalty because the purchase would be deemed by arbitrary rule to have been made at an earlier date; while a sale followed by purchase would never even be within the terms of the rule.[20] We must look elsewhere for an answer to our problem of finding a reasonable and workable interpretation of the statute in the light of its admitted purpose.[21]

---

[15] U. S. Treas. Reg. 103, Art. 19.22(a)-8, 1940, 21 CFR, 1940 Supp., 19.22(a)-8, providing that if corporate shares are sold from lots purchased at different times or prices "and the identity of the lots cannot be determined, the stock sold shall be charged against the earliest purchases of such stock."

[16] Cf. Arthur S. Kleeman v. Com'r, 35 B.T.A. 17; James Cunningham v. Com'r, 29 B.T.A. 717; Robert W. Bingham v. Com'r, 27 B.T.A. 186.

[17] See Helvering v. Hammel, 311 U.S. 504, 510, 61 S.Ct. 368, 85 L.Ed. 303, 131 A.L.R. 1481; Haggar Co. v. Helvering, 308 U.S. 389, 60 S.Ct. 337, 84 L.Ed. 340.

[18] See Snyder v. Commissioner of Internal Revenue, 3 Cir., 54 F.2d 57, 58, 59; Helvering v. Rankin, 295 U.S. 123, 129, 130, 55 S.Ct. 732, 79 L.Ed. 1343. See, also, 2 Paul and Mertens, Law of Federal Income Taxation, 1934, § 18.42. It should be noted that in probably the most famous application of this principle—the rule in Clayton's Case, 1 Meriv., Ch., 572, in English trust law—it is held to apply only among different claimants against a trustee and does not apply in favor of the wrongdoing trustee himself. Cunningham v. Brown, 265 U.S. 1-12, 44 S.Ct. 424, 68 L.Ed. 873; Scott on Trusts, 1939, §§ 517, 518; 4 Bogert on Trusts and Trustees, 1935, §§ 926-928.

[19] Thus, it does not reach the "quasi-short" sale at all; that is, one which differs from a short sale only in that the stock sold is delivered from an investment backlog. A wide avenue for profits would then be left open, as the trading of Kaplan in the present case well illustrates.

[20] Defendants suggest, albeit rather obliquely, an intermediate rule limiting the application of the principle only to stock purchased and sold during the chosen six months' period. On the surface this would appear to prevent complete emasculation of the statute, since it assumes to prevent use of an investment backlog. Actually it makes a rule of most uncertain incidence; thus here it would leave the recovery against Seskis untouched, but reduce that against Kaplan by roughly two-thirds. These uncertain results would be increased, of course, if the period during which the officer actually continued his trading was greater than six months; consider its chance application to, say, a fourteen months' period, which might be divided up into three, or even four, six-month periods starting at different times. And once the general income tax rule is rejected (as we have seen it must be), there is surely no basis for developing this original and uncertain gloss upon it, since it does not aid the statutory intent or fit the statutory language.

[21] Cf. Securities and Exchange Commission v. United States Realty & Improvement Co., 310 U.S. 434, 60 S.Ct.

■ Another possibility might be the striking of an average purchase price and an average sale price during the period, and using these as bases of computation. What this rule would do in concrete effect is to allow as offsets all losses made by such trading. This in effect the district court first planned to do, 46 F.Supp. at page 766, although it did not carry it out fully, since its table as to Kaplan's sales shows only an initial loss on the first transaction showing any loss of $16.98 and does not take into consideration some 1,634 more shares, the losses upon which were not computed. But it corrected this in its supplemental opinion, properly pointing out that the statute provided for the recovery of "any" profit realized and obviously precluded a setting off of losses. Even had the statutory language been more uncertain, this rule seems one not to be favored in the light of the statutory purpose. Compared to other possible rules, it tends to stimulate more active trading by reducing the chance of penalty; thus Kaplan, with his more involved trading, benefits by the rule, whereas Seskis, who bought substantially at one time and sold as a whole, does not. Its application to a case where trading continued more than six months might be most uncertain, depending upon how the beginning of each six months' period was ascertained. It is not a clear-cut taking of "any profit" for the corporation, and we agree with the district court in rejecting it.

■ The statute is broadly remedial. Cf. Wright v. Securities and Exchange Commission, 2 Cir., 112 F.2d 89. Recovery runs not to the stockholder, but to the corporation.[22] We must suppose that the statute was intended to be thoroughgoing, to squeeze all possible profits out of stock transactions, and thus to establish a standard so high as to prevent any conflict between the selfish interest of a fiduciary officer, director, or stockholder and the faithful performance of his duty. Cf. Woods v. City Nat. Bank & Trust Co. of Chicago, 312 U.S. 262, 61 S.Ct. 493, 85 L. Ed. 820; In re Mountain States Power Co., 3 Cir., 118 F.2d 405; Otis & Co. v. Insurance Bldg. Corp., 1 Cir., 110 F.2d 333; In re Republic Gas Corp., D.C.S.D.N.Y., 35 F.Supp. 300. The only rule whereby all possible profits can be surely recovered is that of lowest price in, highest price out— within six months—as applied by the dis-

trict court. We affirm it here, defendants having failed to suggest another more reasonable rule. Cf. Snyder v. Commissioner of Internal Revenue, 295 U.S. 134, 55 S.Ct. 737, 79 L.Ed. 1351.

■ A minor point of construction is the interpretation of the exemption of a security "acquired in good faith in connection with a debt previously contracted." Within the six months' period here involved, defendant Seskis paid a debt owing to defendant Kaplan in stock of the corporation. It is obvious that the stock so acquired by defendant Kaplan was exempt from § 16(b), and the district court properly so held. But defendant Seskis contends that it erroneously refused to exempt the stock which he acquired to discharge the debt. The language of the exemption, however, does not naturally cover this situation, and there is no reason in policy why it should. It would mean that profits could be washed out by the simple expedient of borrowing money to be repaid in stock.

Agreeing, therefore, with the district court's interpretation of the statute and ascertainment of the profits, we turn to the constitutional issues raised by this appeal. Defendants make three claims here: denial of due process of law; that the statute attempts to regulate intrastate transactions; that it improperly delegates legislative authority.

■ First, the statute is interpreted does not infringe due process guaranties. It was enacted only upon a considered finding, supported by ample evidence, of the abuses of inside speculation. In effect it was but a new approach to the common-law attitude which had long recognized the reasonableness of enforcing a level of conduct upon fiduciaries "higher than that trodden by the crowd." See Meinhard v. Salmon, 249 N.Y. 458, 464, 164 N.E. 545, 546, 62 A.L.R. 1. It would not have been unreasonable here to prohibit all short-swing speculation by corporate fiduciaries. Cf. Booth v. People of State of Illinois, 184 U.S. 425, 22 S.Ct. 425, 46 L.Ed. 623; Otis v. Parker, 187 U.S. 606, 23 S.Ct. 168, 47 L.Ed. 323; Oliver Bros. v. Federal Trade Commission, 4 Cir., 102 F.2d 763. See Securities and Exchange Commission v. Chenery Corp., 318 U.S. 80, 63 S.Ct. 454, 461, 87 L.Ed. —: "Abuse of corporate

---

1044, 84 L.Ed. 1293; Burstein v. United States Lines Co., 2 Cir., 134 F.2d 89.

[22] See Yourd, supra note 2, at 150.

240

position, influence, and access to information may raise questions so subtle that the law can deal with them effectively only by prohibitions not concerned with the fairness of a particular transaction." Surely no complaint can be heard of measures less harsh than criminal prohibition. That the evil might have been stamped out by still more lenient measures—a possibility, however, which defendants have failed to make real by concrete suggestion—is without our concern, for in the imposition of penalties Congress has a wide discretion. See Electric Bond & Share Co. v. Securities and Exchange Commission, 303 U.S. 419, 442, 58 S.Ct. 678, 82 L.Ed. 936, 115 A.L.R. 105.

 Bona fide transactions, too, may be caught in the net of the law. But what is legitimately struck at is the tendency to evil in other cases. Cf. Woods v. City Nat. Bank & Trust Co. of Chicago, supra; see Weil v. Neary, 278 U.S. 160, 173, 49 S.Ct. 144, 73 L.Ed. 243. Nor is it a valid objection to the law that it affects stock acquired before the Act.[23] The case is not unlike Uebersee Finanz-Korporation Aktien Gesellschaft v. Rosen, 2 Cir., 83 F.2d 225, certiorari denied 298 U.S. 679, 56 S.Ct. 946, 80 L.Ed. 1400, where the Gold Reserve Act, 48 Stat. 337, was applied to gold, acquired before its enactment. Here, however, the asserted liability seems more an incident of the holding of office than of the ownership of stock. Defendants continued in office after the passage of the Act, submitted to its registration provisions concerning the stock of their corporation, and, we think, assumed the liability of § 16(b). Cf. Ferry v. Ramsey, 277 U.S. 88, 48 S.Ct. 443, 72 L.Ed. 796.

 That transactions on national security exchanges have taken on an interstate character, justifying regulation under the commerce clause, is now beyond doubt. See Electric Bond & Share Co. v. Securities and Exchange Commission, supra, 303 U.S. at page 440, 58 S.Ct. 678, 82 L.Ed. 936, 115 A.L.R. 105; Wright v. Securities and Exchange Commission, supra, 112 F. 2d at page 94; Securities and Exchange Commission v. Torr, D.C.S.D.N.Y., 15 F.Supp. 315, 319, Patterson, J., reversed on other grounds, 2 Cir., 87 F.2d 446. Defendants contend, however, that private sales, such as some of those here transacted, are purely intrastate activities, immune to Congressional regulation. But private sales affect stock quotations on national security exchanges—and thus interstate commerce—no less than the production of an acre of wheat affects the price and market conditions of wheat transported between the states, cf. Wickard v. Filburn, 317 U.S. 111, 63 S.Ct. 82, 87 L.Ed. ——; and no less than the ownership of securities by a holding company whose subsidiaries are engaged in interstate commerce affects the service those companies render, cf. North American Co. v. Securities and Exchange Commission, 2 Cir., 133 F.2d 148. See, also, United States v. Wrightwood Dairy Co., 315 U.S. 110, 62 S.Ct. 523, 86 L.Ed. 726.

 The final constitutional objection is that the statute delegates an undefined and, therefore, unlawful authority to the Commission to grant exemptions. The Commission has promulgated no regulation injurious to defendants, and we are asked to make an abstract determination upon the face of the statute. The request is premature. See United States v. Rock Royal Co-operative, Inc., 307 U.S. 533, 561, 59 S.Ct. 993, 83 L.Ed. 1446; Gorieb v. Fox, 274 U.S. 603, 607, 47 S.Ct. 675, 71 L.Ed. 1228, 53 A.L.R. 1210; Board of Trade of Kansas City, Mo. v. Milligan, 8 Cir., 90 F. 2d 855, 860, certiorari denied 302 U.S. 710, 58 S.Ct. 40, 82 L.Ed. 549; Kuhner v. Irving Trust Co., 2 Cir., 85 F.2d 35, 38, affirmed 299 U.S. 445, 57 S.Ct. 298, 81 L.Ed. 340; President of United States v. Artex Refineries Sales Corp., D.C.S.D.Tex., 11 F.Supp. 189, 192. In any event we think the delegation so clearly lawful that there is no reason to wait for a future more pointed argument. Guiding the Commission in the exercise of an actually limited authority[24] is the quite adequate standard— illustrated by two specific statutory exemptions—that its regulations be consistent with the expressed purpose of the statute. See Wright v. Securities and Exchange Commission, supra, 112 F.2d at page 95. The delegation serves no other than the commendable functions of relieving the statute from imposing undue hardship and of giving it flexibility in administration. Cf. United States v. Shreveport Grain &

[23] There might well be substantial objection to an application of the statute to transactions affected in whole or in part prior to the Act, but the Commission has specifically exempted such activities by Rule X-16B-1 of its "General Rules and Regulations," 17 CFR 240.16b-1.

[24] See Seligman, Problems under the Securities Exchange Act, 21 Va.L.Rev. 1, 22, n. 22.

Elevator Co., 287 U.S. 77, 53 S.Ct. 42, 77 L.Ed. 175.

The total recovery against defendants accruing to the corporation is $18,894.85, plus costs of $38.93. By this, plaintiffs will be benefited only to the extent of about $3, since they own but 150 shares of a total of 800,000. Upon their petition, however, the district court awarded them $3,000 for counsel fees, together with their expenses of $78.98, payable out of the funds accruing to the corporation.

While it is well settled that in a stockholder's or creditor's representative action to recover money belonging to the class the moving party is entitled to lawyer's fees from the sum recovered, this was not strictly an action for money belonging to either class, but for a penalty payable to the corporation. Ordinarily the corporate issuer must bring the action; and only upon its refusal or delay to do so, as here, may a security holder act for it in its name and on its behalf. But this in effect creates a derivative right of action in every stockholder, regardless of the fact that he has no holdings from the class of security subjected to a short-swing operation or that he can receive no tangible benefits, directly or indirectly, from an action because of his position in the security hierarchy. And a stockholder who is successful in maintaining such an action is entitled to reimbursement for reasonable attorney's fees on the theory that the corporation which has received the benefit of the attorney's services should pay the reasonable value thereof. Cf. Hutchinson Box Board & Paper Co. v. Van Horn, 8 Cir., 299 F. 424; In re Natural Dry Ginger Ale Corp., D.C.W.D.N.Y., 9 F.Supp. 1003. That attorneys' fees in actions for damages for manipulation of security prices and for misleading statements are expressly recoverable from the defendant under 15 U.S.C.A. §§ 78i(e) and 78r(a), respectively, does not impinge the result we reach in the absence of statute, for those sections merely enforce an additional penalty against the wrongdoer.

While the allowance made here was quite substantial, we are not disposed to interfere with the district court's well-considered determination. Cf. May v. Midwest Refining Co., 1 Cir., 121 F.2d 431, certiorari denied 314 U.S. 668, 62 S.Ct. 129, 86 L.Ed. 534. Since in many cases such as this the possibility of recovering attorney's fees will provide the sole stimulus for the enforcement of § 16(b), the allowance must not be too niggardly. Cf. Murphy v. North American Light & Power Co., D.C. S.D.N.Y., 33 F.Supp. 567.

Affirmed.