**MARQUETTE CEMENT MANUFAC-TURING COMPANY, Plaintiff,**

v.

**Albert M. ANDREAS and the Andreas Corporation, Defendants.**

United States District Court
S. D. New York.
April 7, 1965.

Davies, Hardy & Schenck, New York City, for plaintiff, John W. Burke, New York City, of counsel.

Nixon, Mudge, Rose, Guthrie & Alexander, New York City, for defendants, Milton Black, Stuart A. Summit, New York City, of counsel.

CASHIN, District Judge.

Plaintiff, Marquette Cement Manufacturing Company (Marquette), brings this action pursuant to Section 16(b) of the Securities Act of 1934, Title 15 U.S. C.A. § 78p(b), to recover profits allegedly realized by the defendants, Albert M. Andreas and The Andreas Corporation (Corporation), on the purchase and sale of Marquette securities within a six month period.

The transaction complained of is somewhat intricate. It involves the sale of all of the assets of the North American Cement Corporation (North American) to Marquette in return for several hundred thousand shares of Marquette common stock. This was followed by the dissolution of North American and a distribution of the Marquette stock to the North American shareholders. The Corporation received a large block of that stock and promptly sold it on the open market.

At all times relevant to this action Albert M. Andreas was the sole trustee of nineteen trusts in which were held all the stock of the defendant corporation. Andreas, himself, was the beneficiary of one of the trusts containing 24.9% of the stock and for the most part members of his family were beneficiaries of the remainder. Andreas was neither an officer nor a director of the defendant corporation.

Prior to the transaction with Marquette the business of the Corporation consisted of the ownership and management of a bowling alley and recreation center in Florida, and the ownership of a large block of North American stock. From March 23, 1960 until February 3, 1961 Andreas served as Chairman of North American's Board of Directors.

During and prior to 1960 Andreas and other members of the family became concerned over increasing competition in the cement industry and the concentration of the Corporation's investments in North American. It was determined that the North American stock should be sold and the investments of the Corporation diversified. Negotiations were begun with several companies, among them Marquette, a large cement company with a readily marketable common stock. On November 9, 1960 a plan of reorganization was negotiated providing for the sale of North American's assets to Marquette in return for Marquette stock, the dissolution of North American and the distribution of the Marquette stock to its stockholders. Because of his extensive knowledge of the cement business in the northeastern United States, Andreas was asked to become a director of Marquette.

On January 10, 1961 the shareholders of Marquette voted to increase the number of shares outstanding, and the shareholders of both Marquette and North American approved the plan of reorganization. On the same day, Andreas was elected a director of Marquette. On January 31, 1961, 575,158 shares of the common stock of Marquette were issued to North American in exchange for an assignment of all of the latter's assets. North American dissolved on February 3, 1961 and on February 6 the Marquette stock became available for distribution to the stockholders of North American. By April 6, 1961 the Corporation had sold all of its Marquette stock on the open market.

The defendants' argument that this case does not present a "purchase" within the meaning of Section 16(b) is without merit. It is clear, both from the preamble to Section 16(b) and from the cases interpreting it, that the primary purpose of the statute is to protect the general investing public and stockholders against short-swing speculation by insiders with advance information. To make the statute effective, an objective standard of proof has been applied. The insider is held liable to the corporation for his profits on a short-swing transaction regardless of any actual misuse of information and regardless of good

faith. Where confidential information might be used, and manipulation is a possibility, Section 16(b) is applicable. Smolowe v. Delendo Corporation, 136 F.2d 231, 148 A.L.R. 300 (2 Cir. 1943).

The defendants present evidence which does suggest that their intentions were good and the transaction innocent. They maintain that their acquisition and sale of Marquette stock was the logical result of a decision made much earlier by the Corporation to diversify its investments. They insist that all the stockholders and directors of both North American and Marquette knew of their plans. These representations and others, even if accepted as true, do not foreclose a "possibility" of abuse.

The defendants try hard to describe their transaction as within the scope of Roberts v. Eaton, 212 F.2d 82 (2 Cir. 1954) where a reclassification of stock was held not to be a purchase. The court held that the transaction could not possibly lend itself to the speculation encompassed by Section 16(b). In the present case, the elements which convince a court that manipulation is impossible, are not present. This is not a case where the stock of all shareholders is reclassified with some guarantee of equal treatment for all, but rather a case where a block of stock is acquired by a separate interest group at a price negotiated by them. Nor is this a case where the defendants retain the same interest in the plaintiff corporation before and after the transaction. Originally, the Corporation held North American stock —after the transaction it held the stock of Marquette. The acquisition here cannot be thought of as comparable to an involuntary conversion. Lastly, Marquette common had long been traded on the New York Stock Exchange and the value of the newly issued stock could not have been a matter of complete speculation.

No difficulty is created by the fact that Andreas was not elected a director of Marquette until the transfer of assets for stock was approved by the stockholders of Marquette and North American. In Adler v. Klawans, 267 F.2d 840 (2 Cir. 1959) Section 16(b) was held applicable "even though the person involved was a director only at the time of sale and not at the time of purchase." The present case, where the assets of a corporation are exchanged for stock and that stock distributed to stockholders, more closely resembles the ordinary Section 16(b) transaction where stock is bought for cash than it does the unorthodox reclassification, consolidation cases where the courts have had to go far to find a purchase. In Stella v. Graham-Paige Motors Corporation, 132 F.Supp. 100 (S.D.N.Y.1955) Judge Dimock held an exchange of the assets of one company for the stock of another to be a "purchase" within the meaning of the statute.

The defendants assert that Marquette knew of all their plans well in advance, wholeheartedly concurred in them, and should be estopped from bringing this action. Corporate acts cannot estop Marquette, "Since the policy of the statute is to protect minority stockholders and the public against manipulated market fluctuations * * *." Magida v. Continental Can Company, 231 F.2d 843, 846 (2 Cir. 1956), Accord, Jefferson Lake Sulphur Co. v. Walet, 104 F.Supp. 20 (E.D.La.1952), Contra, Consolidated Engineering Corp. v. Nesbit, 102 F.Supp. 112 (S.D.Cal.1951). Nor are the defendants exempt from the operation of the Act by virtue of SEC Rule X–16B–5, 17 C.F.R. § 240.16b–5. Rule X–16B–5 is a special situation rule, directed at facilitating management incentive plans. The present transaction does not fit within the letter or the spirit of that exemption. II, Loss, Securities Regulation (2 ed. 1961) p. 1,118, Cook & Feldman, Insider Trading Under the Securities Exchange Act, 66 Harv. L.Rev. 612, 636 (1953), Sec. Ex. Act Rel. 4495 (1950).

Albert Andreas' position on the Board of Marquette made him a corporate insider liable under Section 16(b) for any profits realized by him on a short-swing transaction. It is clear that

through the trust, of which he was a beneficiary, Andreas realized a profit within the meaning of Section 16(b) and he is liable for his proportionate share of the profits of the Corporation on this transaction. Blau v. Lehman, 368 U.S. 403, 82 S.Ct. 451, 7 L.Ed.2d 403 (1962), Rattner v. Lehman, 193 F.2d 564 (2 Cir. 1952).

The plaintiff contends that Andreas was the beneficial owner of the stock held in trust for members of his family, as well as the stock held directly for him. To support this position, the plaintiff relies on several Section 16(a) regulations of the Securities and Exchange Commission. Section 16(a) and the regulations thereunder establish *reporting* standards for insiders. They have only slight significance in assessing insider liability under Section 16(b). (See SEA Release 4801, 18 F.R. 1131 (1953).

Whether Andreas held a beneficial interest in that stock is a question of fact to be determined from all the evidence. Of course, he had the normal interest in seeing that members of his family were well and comfortable, but this does not come within the Section 16(b) definition of "any profit realized by him." Blau v. Lehman, supra, 368 U.S. at p. 414, 82 S.Ct. 451. The statute has never been interpreted to extend liability to profits made upon the disclosure of inside information to others. Smolowe v. Delendo Corporation, supra.

All of the trusts were *bona fide* and not revocable by Andreas, except the one for his benefit. Furthermore, all but that one were for the benefit of individuals with recognizably different interests than the defendant. With respect to Viola Andreas, she and the defendant separated in June of 1960 and were divorced on March 22, 1961. The plaintiff does not present any substantial evidence that the trust beneficiaries received trust proceeds in lieu of support from the defendant.

The plaintiff claims that Andreas acted as the deputy of the Andreas Corporation on the Marquette Board and the corporation should be liable for any profits accumulated by it from the short-swing transaction. That such a deputization is possible seems clear after Blau v. Lehman, supra, but its existence is a question of fact to be settled case by case. Standing alone, the fact that a stockholder in a family corporation has engaged in a short-swing transaction from which the corporation has also benefited, is insufficient to show an actual deputization. Blau v. Lehman, 173 F.Supp. 590 (S.D.N.Y.1959). There has not been sufficient evidence produced to show that Andreas was the deputy of the corporation on the Marquette Board.

The plaintiff also argues that Albert Andreas had such control over the corporation that it should be regarded as his *alter ego* and he should be liable for all profits made by it. Andreas' control over the corporation is one factor to be considered in determining whether he was actually deputized to represent Corporation interests on the Marquette Board. To hold as a matter of law that an insider with interest in another corporation cannot separate these roles would subvert the rationale of the Rattner and Blau cases. Very different issues are presented in Blau v. Mission Corp., 212 F.2d 77, 80 (2 Cir. 1954), where one corporation with absolute control over a second corporation was held to be the real owner of stock held by the latter in a third corporation.

I find that the purchase of stock took place on February 3, 1961, the day on which North American was dissolved. Prior to that date the Corporation was not irrevocably bound to take the stock of Marquette. Blau v. Ogsbury, 210 F.2d 426, 427 (2 Cir. 1954), Stella v. Graham-Paige Motors Corporation, supra, Blau v. Hodgkinson, 100 F.Supp. 361 (S.D. N.Y.1951). Prior to the dissolution of North American, alternatives to the acceptance of the Marquette stock did exist, even if the facts of this case make it likely that none of them would have been chosen.

The law is clear that the purchase price in a short-swing trans-

action is the value of the consideration given up for the newly acquired stock. In this case I must value the North American stock surrendered by the Corporation. Evidence on this issue is noticeably slim but on the basis of what has been presented a valuation must be made. The plaintiff argues that the price at which the North American stock was traded on the purchase date should be conclusive of its value. Since that stock was not freely traded, valuation on that basis would be speculative and unreliable. The North American stock held by the Corporation was exchanged for a block of Marquette common stock, and I find that the most trustworthy measure of the value of the stock surrendered is the value of the block of Marquette common on February 3. II, Loss, Securities Regulation (2 ed. 1961) at p. 1073, Fistel v. Christman, 135 F.Supp. 830, 832 (S.D. N.Y.1955), Stella v. Graham-Paige Motors Corporation, supra. Section 16(b) was intended "* * * to squeeze all possible profits out of stock transactions * * *". Smolowe v. Delendo Corp., supra, 136 F.2d at p. 239. Therefore, in calculating the profit realized it is necessary to set the purchase price at the lowest price at which Marquette common was selling on the New York Stock Exchange on February 3, 1961. Blau v. Lehman, 173 F.Supp. 590, 595, Footnote 3, (S.D.N.Y.1959).

In Adler v. Klawans, supra, 267 F.2d at p. 849, the court noted that—

"* * * the dividend received on a particular share can-not logically be considered as profit separate and apart from the difference between purchase and sale price."

The quarterly dividend, declared and issued after Andreas had been made a director and while the Marquette stock was held by the Corporation, must be viewed as additional profit realized. The "possibility" of insider manipulation of the dividend, noticeably absent in the Adler case, is surely present here. The dividend received on all shares sold at a profit, and the amount by which the dividend creates a profit on shares tech-nically sold at a loss, if any, must be included in assessing total liability. Western Auto Supply Co. v. Gamble-Skogmo, Inc., 231 F.Supp. 456 (D.Minn. 1964).

 Although I have held Mr. Andreas liable in this case, I regard the transaction as an innocent one and refuse to add interest to the judgment.

It should now be a simple matter for the parties to agree on the exact dollar amount of Mr. Andreas' liability to Marquette. If the parties cannot so agree, the court will name a Special Master to determine the amount due Marquette, under Section 16(b) as interpreted by the United States Court of Appeals, Second Circuit, in Smolowe v. Delendo, supra, and subsequent cases.

The action against The Andreas Corporation is dismissed.

The foregoing shall constitute my Findings of Fact and Conclusions of Law.

Settle order on notice.