Michael STELLA, suing in his own behalf and on behalf of all other stockholders of Kaiser-Frazer Corporation similarly situated, Plaintiff,

v.

GRAHAM–PAIGE MOTORS CORPORATION and Kaiser-Frazer Corporation, Defendants.

United States District Court
S. D. New York.
June 9, 1955.

See also 87 F.Supp. 525.

**102**

Lewis M. Dabney, Jr., New York City, for plaintiff. Murray C. Bernays, New York City, of counsel.

Garey & Garey, New York City, for defendant Graham-Paige Motors Corp., Wm. Francis Corson, Ambrose V. Mc-Call, Sol Irving Sokolsky, New York City, of counsel.

Willkie, Owen, Farr, Gallagher & Walton, New York City, for defendant Kaiser-Frazer Corp., H. Bartow Farr, Jr., New York City, of counsel.

DIMOCK, District Judge.

Michael Stella, a stockholder in Kaiser-Frazer Corporation, suing in behalf of himself and all other stockholders similarly situated, brings this action against Graham-Paige Motors Corporation under section 16(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78p(b), quoted in part infra, which gives a right of recovery of short swing profits made by insiders. Kaiser-Frazer, having refused to bring this action after being requested to do so by plaintiff, is also named as a defendant.

Graham-Paige, in 1947, transferred its automotive assets to Kaiser-Frazer and received in return, 750,000 shares of Kaiser-Frazer stock and Kaiser-Frazer's agreement to pay principal, interest and trustee's and paying agent's service charges with respect to an outstanding issue of Graham-Paige's debentures. Later in the year Graham-Paige sold 155,000 shares of the stock so acquired. Plaintiff's theory is that Graham-Paige by the initial transaction became the holder of more than 10% of Kaiser-Frazer's outstanding stock so as to come within the purview of section 16(b), that there was a "purchase" and a "sale" of the 155,000 shares of stock within a "period of less than six months," that Graham-Paige realized a profit of $434,-787.86 which is recoverable under the statute and that Graham-Paige is estopped to say that it did not realize a profit.

Graham-Paige resists plaintiff's claim on a number of grounds. First, that its acquisition of Kaiser-Frazer stock was not a "purchase" within the meaning of the statute and further that, if the statute were held to be applicable to this acquisition, it would be unconstitutional as so applied. Second, that the facts of this case bring it within a specific exception contained in section 16(b). Third, that in this case there was no "purchase and sale * * * within any period of less than six months" within the meaning of that expression in the statute. Fourth, that, in any event, it realized no profit from the sale of the Kaiser-Frazer stock involved here. Fifth, that it is not estopped to say that it did not realize a profit.

I.

The Initial Transaction
As a "Purchase".

■ Graham-Paige's argument that section 16(b) is not applicable here is without merit. It is based upon the contentions that the transaction by which Graham-Paige acquired Kaiser-Frazer stock was intended by Graham-Paige to be a sale of its automotive assets to Kaiser-Frazer rather than a purchase by it of Kaiser-Frazer stock and that Graham-Paige had no speculative intent at the time of acquisition. It is not at all clear to me that Graham-Paige would have been as satisfied to have had cash substituted for the stock which it received but, even assuming that this would have been the case, the acquisition of stock was a "purchase". Section 16 (b) specifically excludes as a factor to be considered in cases arising under it the presence or absence of speculative intent at the time of the critical purchase or sale. See, Smolowe v. Delendo Corporation, 2 Cir., 136 F.2d 231, 235–236, 148 A.L.R. 300. Graham-Paige cites only one case in support of the argument that its desire to sell assets rather than

acquire stock prevents the acquisition from being a "purchase". That case, Roberts v. Eaton, 2 Cir., 212 F.2d 82, involved a reclassification of outstanding stock binding upon all stockholders. The Court of Appeals, in affirming the lower court's decision for defendant, said, at page 86, that "[t]he reclassification * * * could not possibly lend itself to the speculation encompassed by § 16 (b)." The court gave no consideration to subjective factors such as those which Graham-Paige would have me consider here. Thus the Roberts case is not apposite.

Graham-Paige admits that section 16(b) has been held to be constitutional and fails to give any reason for its assertion that application of the section here would be unconstitutional. I can think of no valid reasons in support of the argument and I therefore reject it.

I find that Graham-Paige's acquisition of 750,000 shares of common stock of Kaiser-Frazer was a "purchase" of said stock within the meaning of section 16 (b).

## II.

### Purchaser's Ownership of 10% at Time of Purchase.

Graham-Paige's argument that the transaction at bar is within the specific statutory exception of section 16(b) is based upon the following language in that section:

"This subsection shall not be construed to cover any transaction where such beneficial owner was not such both at the time of the purchase and sale * * *."

The argument is that, since Graham-Paige was not the beneficial owner of 10%, see section 16(a) of the Act, 15 U.S.C. § 78p(a), of Kaiser-Frazer stock before the time of the purchase, the transaction is exempted. This argument, presenting a pure question of law, was made to Judge S. H. Kaufman by Graham-Paige in support of a motion for summary judgment in this case. He rejected it and denied summary judgment

for reasons which convince me. Stella v. Graham-Paige Motors Corp., D.C.S.D. N.Y., 104 F.Supp. 957. His decision is the law of this case and I would not be free to disturb it even if I disagreed with it.

## III.

### The Transaction As Within the Short Swing Period.

Section 16(b) provides in part:

"(b) For the purpose of preventing the unfair use of information which may have been obtained by such beneficial owner, director, or officer by reason of his relationship to the issuer, any profit realized by him from any *purchase and sale,* or any sale and purchase, of any equity security of such issuer (other than an exempted security) *within any period of less than six months,* * * * shall inure to and be recoverable by the issuer, irrespective of any intention on the part of such beneficial owner, director, or officer in entering into such transaction of holding the security purchased or of not repurchasing the security sold for a period exceeding six months. * * *" (Emphasis supplied.)

Graham-Paige argues that this language means that in order that any profit realized be recoverable by the issuer both the "purchase" and the "sale" must occur within a period of less than six months. I agree. That is exactly what the statute says.

Graham-Paige contends that the "purchase" and the "sale" here did not both occur within a "period of less than six months". If that is so I shall not need to decide whether or not Graham-Paige realized a profit. As part of its argument Graham-Paige construes the words "period of less than six months" to mean a period the first and last days of which each include the twenty-four hours from midnight to midnight, and the last day of which is the second day prior to the date corresponding numerically to that of the first day of the period in the sixth succeeding month. For example, the pe-

riod from and including January 1st to and including June 29th would be a "period of less than six months" but the period to and including June 30th would be a period of exactly six months. Thus profit realized from a purchase on January 1st and a sale on June 30th would not be recoverable under the statute.

■ That construction is correct. I cannot brush aside the congressional choice of the words "less than". To be less than six months the statutory period must be six months minus one full period from midnight to midnight since the law does not take into account fractions of a day. 2 Bl.Com. 141. This was the construction adopted without comment by Chief Judge Clark in Smolowe v. Delendo Corporation, 2 Cir., 136 F.2d 231, 234, 148 A.L.R. 300, supra, where he described the statutory period as running from December 1st to the following May 30th—rather than to June 1st as the lower court had described it.

Plaintiff's argument that the statutory period embraces six months plus one day is based on decisions where the problem was to determine when a period of given length, reckoned "from" or "after" or "before" a date, began. Burnet v. Willingham L. & T. Co., 282 U.S. 437, 51 S.Ct. 185, 75 L.Ed. 448; Cornell v. Moulton, 3 Denio, N.Y., 12; Joint Counsel, etc., v. Delaware, L. & W. R. Co., 2 Cir., 157 F.2d 417; Kimm v. Osgood's Adm'r, 19 Mo. 60; Dutcher v. Wright, 94 U.S. 553, 24 L.Ed. 130. Here the problem is to determine whether the two events occurred within any period of the given length. Fogel v. Commissioner of Internal Revenue, 5 Cir., 203 F.2d 347, 348, which held that goods purchased on June 19th and sold on December 19th were not "held for more than six months," seems to me to represent a construction of that statute as meaning "held for more than six months *after the purchase*". It would be a contradiction in terms to construe this statute as meaning "purchase and sale within any period of less than six months *after the purchase*". There could be no such thing as a pur-

chase "within" a period that did not start until after the purchase.

To support an argument that the period includes at least a full six months plaintiff points to the fact that section 16(b) goes on to say that the profit shall be recoverable irrespective of the intention of the purchaser of holding the security sold "for a period exceeding six months." I regard the expression as a mere referential inaccuracy which cannot prevail over the language used by Congress in creating the cause of action. Graham-Paige is correct in saying that, to create liability for the profit realized, both the purchase and sale must have occurred within a period corresponding to that beginning at morning on January 1st and ending at night on June 29th.

Even though I agree with Graham-Paige's reading of the statute as to the period which it limits, I cannot agree with its contention that the purchase and sale here did not occur within that period.

Subsection (a) (13) and (14) of section 3 of the Securities Exchange Act of 1934, 15 U.S.C. §§ 78c(a) (13), 78c (a) (14), read:

"(13) The terms 'buy' and 'purchase' each include any contract to buy, purchase, or otherwise acquire.

"(14) The terms 'sale' and 'sell' each include any contract to sell or otherwise dispose of."

■ Until a contract is a firm commitment, i. e., until both parties are bound, there is no "purchase" or "sale" under the Act. Blau v. Ogsbury, 2 Cir., 210 F.2d 426. Graham-Paige argues that in the case of a purchaser there is a "purchase" when he knows that he has a right to acquire a fixed number of shares at a fixed price and, in support of this theory, cites the following language from the Ogsbury case, at page 427:

"It matters not to the speculator who has title or possession or who can vote the stock or receive dividends. What he needs is firm assurance that a fixed quantity can be acquired or disposed of at a fixed

price; and his commitments are on that basis. And speculation, actual or potential, is the only vice within the purview of § 16(b). Other possible abuses of stock options do not now concern us."

Graham-Paige, in arguing that I should adopt the construction of this language favorable to its position, fails to take account of the fact that in that case the court held that the purchase occurred on the date of exercise of a stock option. On that date the buyer and the seller were bound. If the quoted language were to be read literally, the date of purchase would have been the date on which the option had been acquired, because on that date the purchaser knew that during the term of the option he had a right to acquire a fixed number of shares at a fixed price. Even before he exercised the option the purchaser was in a position to speculate. Graham-Paige's argument further fails to take account of this language, which appears at page 427:

"* * * we agree with Judge Bondy that the 'purchase' was consummated * * * when Ogsbury mailed his notice of election and thereby incurred an irrevocable liability to take and pay for the stock."

In the present case the earliest date upon which both parties to the agreement pursuant to which Graham-Paige acquired 750,000 shares of Kaiser-Frazer stock were bound was February 10, 1947, the closing date. Up until that date the agreement, dated December 12, 1946, could have become operative only upon the occurrence of certain events, specifically provided for by its terms. One of these events was the transfer by Graham-Paige to Kaiser-Frazer, along with Graham-Paige's automobile business, of the sum of $3,000,000. Graham-Paige did not have this cash and the agreement specifically provided that Graham-Paige would use its best efforts to borrow this amount from a certain bank, in accordance with a certain letter agreement between that bank and Gra-ham-Paige, but that, if Graham-Paige were unable to obtain the loan in accordance with the letter agreement, it might elect to terminate the agreement with Kaiser-Frazer. The letter agreement provided that a condition of the bank's obligation to make the loan was that it would be guaranteed, jointly and severally, by Joseph W. Frazer, Graham-Paige's president, and the Henry J. Kaiser Company. Frazer executed the contract of December 12, 1946 so that may be said to have been bound to execute the guarantee. There is no evidence, however, that the Henry J. Kaiser Company became bound to execute the guaranty at any time prior to the closing meeting held on February 10, 1947 when it did so. To come within the same less-than-six months' period with the purchase, therefore, the sale would have to have taken place on or before August 8, 1947.

I pass to the question of the date of the sale. The sale of the 155,000 shares of Kaiser-Frazer stock took place in three transactions: a block of 10,000 shares was sold to one Frederick Lewisohn, a block of 45,000 shares was sold to investors through Otis & Company and a block of 100,000 shares was sold to Permanente Metals Corporation, a corporation substantially owned and controlled by Henry J. Kaiser. A firm contract for the sale of 10,000 shares to Lewisohn was executed by both parties on August 5, 1947. There was a misunderstanding about the Otis sale. Otis & Company purported to sell the stock to customers as agent for Graham-Paige in two blocks, one of 40,000 shares on August 4th, and one of 5,000 shares on August 5th. When Graham-Paige received confirmations on August 6th, Jennings, its secretary, telephoned Otis & Company and said that the sale would have to be to, rather than through, Otis, because of requirements in connection with the Securities Exchange Commission. Otis convinced him that the sales had been made under circumstances that satisfied the requirements and wrote him a letter on August 6, 1947, detailing the facts. The

Otis sales were thus ratified by Graham-Paige on either August 6th or the next day when the letter presumably arrived. The Permanente sale was embodied in a formal contract on August 5th. Thus on the face of things, the last of the contracts for the sale of the aggregate of 155,000 shares became binding, at the latest, on August 7, 1947.

Graham-Paige argues, however, that none of these purported contracts of sale were effective until Henry. Kaiser authorized the release from a voting trust of 155,000 of the 750,000 shares that Graham-Paige had acquired in the manner above described. That authorization did not take place until the evening of August 8th.

■ ' I cannot see that Graham-Paige's inability to acquire a particular block of 155,000 shares to fulfill its commitments would have any effect upon those commitments as "sales" within the meaning of the statute. For example a contract for the sale of stock which the seller expected to fill by delivering stock which was subject to a pledge at the time of the making of the contract would result in a "sale" as of that time rather than as of the date that the seller succeeded in redeeming it from the pledge.

■ Graham-Paige makes another argument for fixing the date of sale at a time later than the making of the contract. The argument applies only to the 100,000 shares sold to Permanente. It is said that the contract was unenforceable because Henry Kaiser signed it on behalf of Permanente under a mistake as to its contents. The conclusion sought to be drawn is that the Permanente sale did not take place until the actual closing of the transaction on August 9th or at least until August 8th when Henry Kaiser in effect expressed his willingness to carry out the contract by releasing from the voting trust 100,000 shares of Kaiser-Frazer stock for Graham-Paige to use in fulfilling its contract of sale to Permanente. Though the mistake appears to have been an honest one, the evidence is wholly insufficient to establish the circumstances necessary to make such a mistake the basis for the conclusion that the Permanente contract was void. I therefore hold that the Permanente sale took place on August 5th, within the same less-than-six months period with the purchase, rather than on August 9th, outside of that period.

Of the 155,000 shares sold, therefore, 10,000 shares were sold to Lewisohn on August 5, 1947, 100,000 shares were sold to Permanente on August 5th and 45,000 were sold to customers of Otis & Company, not later than August 7th. As appears above, the "purchase" took place on February 10, 1947, and the latest date within the same less-than-six months period was August 8, 1947. All of these dates thus fell within the time limited by section 16(b). I therefore cannot escape the necessity of determining whether a profit was realized.

### V.

#### The Realization of a Profit.

■ Plaintiff has the burden of demonstrating that Graham-Paige has "realized" a "profit" from a "purchase and sale * * * within" a period of less than six months. Plaintiff charges that Graham-Paige made a purchase and a sale of 155,000 shares of Kaiser-Frazer stock within that period and realized a profit therefrom. Has plaintiff proved that a profit was realized?

The determination of that question is not the simple matter that would be presented if Graham-Paige had bought the stock for X dollars and sold it for Y dollars. While the stock was sold for $1,046,250, it was acquired, not by paying a sum of money for it, but by exchanging a miscellaneous collection of assets for it. Worse still, the stock was not acquired by itself, but in a package deal in which other items were acquired en bloc with it.

■ An exchange of assets for stock constitutes a "purchase" within the meaning of the statute. See Shaw v. Dreyfus, 2 Cir., 172 F.2d 140, 142; Park & Tilford v. Schulte, 2 Cir., 160 F.2d 984, 987; Blau v. Hodgkinson, D.C.S.D.N.Y., 100 F.Supp. 361, 373–374;

Truncale v. Blumberg, D.C.S.D.N.Y., 80 F.Supp. 387, 392. Thus any excess of the amount of cash finally realized on the sale of the stock over the value of the assets exchanged for the stock on its acquisition constitutes a "profit" within the meaning of the statute.

When the purchase of the Kaiser-Frazer stock was made it was selling in the market at 9⅝. When the sale was made it was selling at 7½. Certainly if the prices at which the purchase and sale were made were fixed with any regard to the market, plaintiff is wrong in claiming that a profit was made. See Truncale v. Blumberg, D.C.S.D.N.Y., 88 F.Supp. 677. The price at which the sale was made, 6¾, was close to the market, the reduction evidently having been made as an incentive to purchasers where such a large amount was offered. We ought to be justified in assuming that the purchase was made at a price near the market since the directors of Kaiser-Frazer would not have been justified in selling it below the market. The market price of Kaiser-Frazer shares at the time of the purchase is some evidence, therefore, of the dollar measure of the assets exchanged for them. As a matter of fact, the directors of Kaiser-Frazer had occasion to consider the per share value of the stock as of December 3, 1946. The chairman of the board said at a meeting at that time that, since the book value was approximately $10 a share and the market value $8 a share, it was probable that the net proceeds of a sale of the 750,000 shares to the public would not be more than $6.50 a share and that figure was adopted for Kaiser-Frazer's bookkeeping purposes. By a parity of reasoning the maximum net proceeds of a sale to the public at the time of purchase, when the market price was 9⅝, would be somewhat higher than $6.50 a share, certainly high enough to equal the figure of 6¾ at which the 155,000 shares were sold. If we argue from the market price, therefore, Graham-Paige made no profit.

The problem may also be approached, however, by ascertaining the value of the assets exchanged for the stock. That involves first valuing the assets exchanged for the whole package, then valuing the nonstock items in the package, and then subtracting the latter valuation from the former to get the valuation of the stock item.

Following this method, plaintiff supported its allegation of a profit of $434,787.86 by offering evidence that the exchanged assets were worth $11,482,686.20, that the nonstock package items were worth $8,524,000 and that the stock consequently cost $2,958,686.20 or slightly less than $3.94½ per share as opposed to the $6.75 per share for which it was sold. Graham-Paige introduced evidence that the exchanged assets were worth well over $20,000,000 and the nonstock package items substantially nothing. This confronted plaintiff with the burden of showing that the true valuation of the exchanged assets was so low, and/or the true valuation of the nonstock package items was so high, that the actual cost of the 155,000 shares of stock was less than its selling price of $6.75 per share. Plaintiff has not met this burden.

The evidence has convinced me that the exchanged asset figure of $11,482,686.20 and the nonstock package items figure of $8,524,000 are both so unreliable that I cannot say that the correct figure for the first is low enough and the correct figure for the second high enough to establish a purchase price less than the selling price of 6¾.

First let me consider the evidence as to the value of the exchanged assets which plaintiff says were worth no more than $11,482,686.20. That was the book value of the tangibles plus $737,654.51 for deferred assets.

Defendant introduced expert testimony to the effect that included in the exchanged assets were intangibles of substantial value which had not been taken into account in plaintiff's figures. Joseph W. Frazer, chairman of the board of directors of Graham-Paige at the time of the transactions involved in this case and conceded by plaintiff to be an expert in the field of automobile production and

distribution, outlined defendant's efforts and expenditures made in its bid to re-enter the automobile business after World War II. As early as 1945 defendant began to spend considerable sums of money on advertising in an effort to bring to public attention the name "Frazer", which was the name of defendant's automobile. Frazer testified that no less than $3,000,000 was invested by defendant in the organization of a distribution system. During 1945 and 1946 large sums of money were applied by defendant to design and development of a car that would be acceptable to the public. Frazer testified that these and other expenditures had resulted in the creation of good will, an automobile design, production facilities and availability of distribution outlets which were assets of great value. He said that the dealer organization was worth at least the $3,000,000 that it had cost to set it up, that the rights to the services of one Darrin as designer and the Darrin designs and patents which Graham-Paige owned were assets which he would not have sold for $1,000,000, that the national advertising was worth from $2,000,000 to $3,000,000. He expressed his belief that the rest of the intangibles transferred were of great, though imponderable, value, and that to the whole should be added a going concern value so that the intangibles transferred would have been worth from $10,000,000 to $30,000,000 but for the lack of cash to carry on.

Mr. James D. Mooney, who qualified as an expert in the automobile business, having been in it for about 55 years and having been executive vice president of the General Motors Corporation and chairman of the Board of Willys-Overland Motors, Inc., testified that the intangibles were worth about $10,000,000.

There is evidence that Kaiser-Frazer too, considered the intangibles that it was to receive from Graham-Paige to be of great value. As early as December 3, 1946, the Board of Directors of Kaiser-Frazer discussed the proposed transaction. At that time they were willing to value the intangibles which Kaiser-Frazer would receive at $2,775,000 in determining that the consideration to be received from defendant was *at least equal* to the value of the stock to be issued to defendant.

Plaintiff did not attempt to adduce any evidence contrary to that adduced by Graham-Paige but satisfied himself with attacking Graham-Paige's evidence through cross-examination of Graham-Paige's witnesses and argument in his briefs submitted after trial. Thus plaintiff chose to rely upon the eventuality that I would refuse to give credence to the substantial amount of evidence adduced by Graham-Paige in opposition to plaintiff's prima facie case.

To meet Graham-Paige's evidence tending to show a substantial value for intangibles in the exchanged assets plaintiff argues in his brief that this evidence did not relate to the "market value" of the intangibles, that is, the amount realizable upon sale to a "willing buyer". However, in the same brief, a few pages later, plaintiff admits that under the conditions obtaining at the time of the purchase there was no market for Graham-Paige's automotive assets, tangible or intangible. Plaintiff admits that Graham-Paige was, in fact, an "unwilling" seller and Kaiser-Frazer was in fact an "unwilling" buyer of the automotive assets. In the face of these admissions it hardly lies in plaintiff's mouth to demand proof of market value. When there is no market value it is proper to turn to other relevant factors in determining the value, see De La Rama S. S. Co. v. United States, 2 Cir., 206 F.2d 651, and Graham-Paige introduced evidence of other factors which I do not think plaintiff has overcome.

Plaintiff has argued that, considered in terms of the "willing buyer" test, the fixed assets were overvalued in arriving at the $11,482,686.20 figure. He has not, however, offered evidence of the extent of such overvaluation. Anyway, as I have pointed out above, plaintiff having admitted, in fact asserted, that there was no "market" for what defendant ex-

changed, the "willing buyer" test is inapplicable. Courts cannot value assets for which there can be but one buyer by reference to what a hypothetical willing buyer would pay for them.

In the face of Graham-Paige's substantial evidence that intangibles not included in the book value of $11,482,686.20 had a value of the order of $10,000,000, I cannot find that the value of the exchanged assets was anywhere near as low as that book value.

So much for the valuation of the exchanged assets. Plaintiff's evidence of the value of the nonstock package items is just as unsatisfactory as his evidence of the value of the exchanged assets. The nonstock package items consisted of: (a) an agreement by Kaiser-Frazer to pay principal of and future interest on an issue of $8,524,000 of 4% Convertible Debentures of Graham-Paige due April 1, 1956. (b) an agreement by Kaiser-Frazer to pay the interest accrued on said debentures from October 1, 1946, to the closing date. (c) an agreement by Kaiser-Frazer to pay all of the fees of, and disbursements to be incurred by, the trustee and paying agent of said debentures from and after the closing date.

In making up its income tax return and on its books of account Graham-Paige valued Kaiser-Frazer's promise to pay principal of, and accrued and future interest on, the debentures at par, or $8,524,000. No account was taken of the value of the promise to pay service charges. Plaintiff has followed the same course in making up his claim.

Since plaintiff has offered no evidence of the value of the obligation to pay the service charges I can assign no value to it.

An expert in the valuation of securities testified for Graham-Paige that the obligation to pay principal of, and accrued and future interest on, the debentures was worth little or nothing in view of Kaiser-Frazer's precarious financial condition in February 1947. In spite of the fact that Kaiser-Frazer had lost $19,200,000 in 1946, reducing its net capital and surplus to $34,400,000, I cannot give full credence to a zero valuation for the promise. The obligation to pay accrued interest would mature on April 1, 1947, and the amount payable was $124,299. It, without anything else, would seem to be worth par. Nevertheless the obligation to pay the debentures at their maturity in 1956 and 4% interest in the meantime certainly was not worth enough to put the total up to plaintiff's appraisal at par of the debentures. Moreover plaintiff's sole support for his appraisal at par is the treatment on Graham-Paige's books. Except for that I have no basis for criticising the expert's appraisal except my own skepticism. Since the result that we are seeking is the product of two variables it is impossible to say how much effect a change in only one of them would produce. Taking an assumption for the purposes of turning one into a constant, however, and assuming as low a valuation for the exchanged assets as the $11,482,686.20 at which plaintiff appraises them in its claim, we would have to assign to the nonstock package items a figure at least as high as $6,420,186.20 in order to fix a purchase price for the stock that would equal the sale price. To show any profit, the nonstock package items would have to be valued even higher. If we deduct from the $6,420,186.20 the amount of the accrued interest of $124,299, we still have $6,295,887.20 as the necessary valuation of the promise to pay $8,524,000 of debentures. That would mean a price of almost 74 for a 4% obligation of the harassed Kaiser-Frazer maturing nine years in the future. That is incredible in the light of expert testimony that such an obligation would have little or no value.

Plaintiff's prima facie proof of the value of the exchanged assets and the nonstock package items has been shown to be unacceptable. He has not met the burden of showing that the true valuation of the exchanged assets was so low and/or the true valuation of the nonstock package items was so high that the ac-

tual cost of the 155,000 shares of stock was less than its selling price of $6.75 per share.

## VI.

### Estoppel.

Plaintiff urges that Graham-Paige, by its reports of a profit to its stockholders, the SEC, the New York Stock Exchange and the Bureau of Internal Revenue, is estopped to deny that it realized a profit from the sale of stock.

Graham-Paige admits that in a number of its records a profit item appears and is attributed to the stock sale at issue. These records may properly be considered as some evidence that a profit was realized and I have so considered them. Plaintiff goes further and says that Graham-Paige should not be permitted to now deny the correctness of the profit item.

While the prior statements were some evidence that Graham-Paige made a profit, they were not made in a form which would conclusively estop the declarant from denying that a profit was made, so that even assuming that some sort of estoppel would be operative if the statements had been wholly inconsistent, a very large assumption I believe, no estoppel can be applied here.

On each of the documents upon which plaintiff relies with one exception, Graham-Paige's 1947 tax return, there appeared a note which called attention to the fact that the figure booked as the cost to Graham-Paige of the stock which it acquired was an "assigned value". Further, in the financial statements in which the stock purchase was outlined it was pointed out that both the market price and Graham-Paige's net equity in Kaiser-Frazer represented by the stock were higher than the "assigned value" of the purchased stock. In view of the fact that this "assigned value" was derived merely by subtracting the face amount of the debentures which Kaiser-Frazer had promised to pay from the book value of the tangible and deferred assets given by Graham-Paige, and in view of the fact that it was expressly noted that the remainder was less than either the market value of the stock received or the net equity in Kaiser-Frazer which the stock represented, it is impossible for me to say that Graham-Paige represented that the remainder in the above-mentioned calculation was, in fact, the cost of the stock which it acquired. It follows that the recording of a profit based on this "cost" was no representation that a profit, in fact, had been realized.

It is quite true that Graham-Paige, in its return for 1947, reported a capital gain on the sale of the stock. This statement of a profit was, of course, unqualified. While at first glance this willingness to pay tax on a profit attributable to the sale of stock seems inconsistent with Graham-Paige's present position, study of the surrounding factors reveals that this apparent inconsistency is unreal. The intangibles which Graham-Paige has urged were a part of the consideration given by it were all derived from its efforts to reestablish itself in the automobile business after World War II. There were expenditures, for example, for advertising, design and establishment of a dealer system. These expenditures began very late in 1944 or early 1945. It appears that during these years the situation so far as Graham-Paige's automobile business was concerned was one of substantial amounts of money going out and nothing coming in. Production in quantities large enough to be profitable was not attained at the Willow Run plant until 1947 and, by February 1947, Graham-Paige had sold its automobile business to Kaiser-Frazer, its former partner in the Willow Run operation. As a result the expenditures, which Graham-Paige had made in 1945 and 1946 and now claims to have created valuable intangible assets, were reported as losses and expenses during those years for tax purposes. From the tax point of view it would have been improper for Graham-

Paige to include in the consideration given for the stock any figures representing intangible assets since it had already deducted the sums expended in the creation of such assets from past income. Thus the fact that Graham-Paige's income tax profit differed from its actual profit is no more than an example of a phenomenon familiar to all.

Since I find that none of the statements cited by plaintiff are inconsistent with Graham-Paige's present position Graham-Paige cannot possibly be estopped to make its present stand.

Even if they were inconsistent, I do not think that a case of estoppel would be made out.

Plaintiff cites Deitrick v. Greaney, 309 U.S. 190, 60 S.Ct. 480, 84 L.Ed. 694, as a case which controls in the circumstances here. In that case the receiver of a national bank sought to compel payment of a promissory note knowingly given to the bank by one of its directors so that the bank's purchase and retention of its own shares in violation of the National Banking Act, 12 U.S.C. § 21 et seq. would be concealed. The court, in sustaining the plaintiff's contention that the defendant should not be permitted to show that the parties never intended the note to be binding upon defendant, said that the facts presented did not justify an estoppel, as such, but that the policy of the Banking Act precluded the release from liability of makers of such fictitious notes. Plaintiff has not shown, and, indeed, does not contend, that Graham-Paige knowingly misstated the cost of and profit realized from the sale of the stock in issue here. Notes to all of the statements relied upon by plaintiff mentioned the fact that the cost of the stock as carried on the books was an "assigned" value. The policy which controlled the Supreme Court's decision in the Deitrick case certainly finds no parallel in this one.

Plaintiff cites also Holly Hill Citrus Growers' Ass'n v. Holly Hill Fruit Prod., 5 Cir., 75 F.2d 13. There plaintiff, in promoting the organization of defendant, had, by public statements, given to prospective investors in defendant reason to believe that defendant would succeed to certain trade marks of which plaintiff was the owner. The two corporations had, at the time of the organization of defendant, common officers. Plaintiff did not expressly assign the trade marks to defendant. Plaintiff's suit for infringement was unsuccessful. At least insofar as the real parties in interest, the investors in defendant, were concerned, all of the requirements for an estoppel in pais were present. The facts in the case at bar are wholly different.

Plaintiff quotes the following language from Lewis v. Atlas Corporation, 3 Cir., 158 F.2d 599, 602: "Plaintiff can hardly be in a position of asserting the existence of an agreement before a public regulatory body and denying it before a court" and says that it is authority for the proposition that the doctrine of estoppel by inconsistent position in proceedings before a court has been extended to include estoppel by inconsistent position in proceedings before the SEC. In the case at bar, the position alleged to have been taken by Graham-Paige with the SEC was not taken at an administrative hearing. Even if the Lewis case goes as far as plaintiff claims, therefore, it is not applicable here.

Thus I cannot agree with plaintiff that Graham-Paige is estopped to deny that it realized a profit on the sale of 155,000 shares of the common stock of Kaiser-Frazer.

I have studied the proposed findings of fact and conclusions of law submitted by both parties and have indicated my acceptance or rejection of each of them by notations in the margin. In passing on the requests to find I have in most instances denied without reference to the facts requests for findings as to the words or substance of written instruments or testimony and requests which seemed to me to seek only rulings on legal questions. Beyond those which I have accepted this opinion will consti-

tute findings of fact and conclusions of law except to the extent that the parties choose to submit further specific ones to formalize those embodied herein.

Since I am not satisfied by the preponderance of the evidence that Graham-Paige realized a profit on its sales of 155,000 shares of the common stock of Kaiser-Frazer, I find for Graham-Paige and deny the relief which plaintiff seeks.