**Michael STELLA, suing on his own behalf and on behalf of all other stockholders of Kaiser-Frazer Corporation similarly situated, Plaintiff,**

**v.**

**GRAHAM–PAIGE MOTORS CORPORATION and Kaiser-Frazer Corporation, Defendants.**

United States District Court
S. D. New York.
March 12, 1957.

Lewis M. Dabney, Jr., New York City, for plaintiff, Murray C. Bernays, New York City, of counsel.

Garey & Garey, New York City, for defendant Graham-Paige Motors Corp., Wm. Francis Corson, Ambrose V. McCall, Sol Irving Sokolsky, New York City, of counsel.

DIMOCK, District Judge.

This action under section 16(b) of the Securities Exchange Act of 1934, 15 U.S.

C. § 78p(b), which gives a right of recovery of "short swing" profits made by insiders, was tried before me. After trial I filed an opinion, D.C., 132 F.Supp. 100, in which I held that plaintiff had made prima facie proof that defendant Graham-Paige Motors Corporation had made a profit of $434,787.86 on a short swing purchase and sale of stock of defendant Kaiser-Frazer Corporation. I further held, however, that plaintiff had not only the burden of making prima facie proof of profit by Graham-Paige but also the burden of establishing the fact of profit by a preponderance of the evidence. This burden of establishing profit by a preponderance of the evidence I held plaintiff had not sustained and I consequently denied recovery.

The Court of Appeals held on appeal, however, 2 Cir., 232 F.2d 299, 302, that I was wrong in holding that plaintiff, after establishing a prima facie case, continued to bear the burden of proof. The true rule, as I am instructed by the Court of Appeals, is that a "beneficial owner" who buys and sells within the statutory period is to be regarded as a fiduciary who violates his duty of loyalty and who must therefore account for his profits and that "once a cestui shows a breach of such a duty and prima facie proof of a maximum amount of profits made by the fiduciary, then the fiduciary has the burden of proving to what extent the profits were less than this maximum—especially where the fiduciary's breach is responsible for the difficulty or impossibility of proving the amount with certainty—and that consequently, if the fiduciary's proof leaves the amount uncertain, judgment goes against him for the maximum figure."

■ The case was therefore remanded to me with directions that I make a specific finding on the issue as to whether Graham-Paige discharged this burden of showing that and to what extent the profits realized were less than the maximum of $434,787.86 indicated by plaintiff's prima facie proof.

The parties have briefed this question and submitted it to me on the original record. I find that defendant Graham-Paige has discharged the burden of showing that no profits were realized.

The making of this finding requires a much more exhaustive consideration of the evidence than was necessary when I merely examined the question whether plaintiff had sustained the burden of proof that profit was made. Then it was unnecessary for me to determine whether or not Graham-Paige actually profited from the two transactions and I refused to make any finding on that question. Now I must examine the evidence in an attempt to do so.

I begin, as I did before, with the highly significant circumstances that when defendant "purchased" the Kaiser-Frazer stock it was selling on the market at 9⅝, that when defendant sold it it was selling at 7½, and that defendant actually realized 6¾. I hold that those circumstances constitute evidence that no profit was made. The directors of Kaiser-Frazer were under a duty to obtain full value for any stock which it sold. Those in control of Kaiser-Frazer were intimately familiar with the value of the Graham-Paige exchanged assets. There is thus a fair inference against Kaiser-Frazer that Graham-Paige paid for the stock what it would have cost in the market. True, such a large block would change hands either above or below the market if either the buyer or the seller was under greater compulsion than the other. If both were equally desirous of putting the deal through, however, there is no reason to suppose that the sale would take place at other than the market price. Here I find that the parties were equally anxious to make the trade of stock and non-stock package items for the Graham-Paige exchanged assets hereinafter more fully described. Hence I infer and find that Graham-Paige paid at least 9⅝ for the stock. Since it sold at 6¾ it lost at least 2⅞ a share or a total of $445,625 on the 155,000 shares.

The same result is derived from the market prices by another method. As will hereinafter more fully appear, the Graham-Paige exchanged assets consist-

ed of tangible and intangible items. If the cost of the stock is to be ascertained by appraisal of the exchanged assets and the non-stock package items, therefore, the trier of the facts is faced with the task of valuing intangible items like good will, an automobile design, production facilities and availability of distribution outlets.

Where there is no ready means of converting into dollars and cents "imponderables" that have been traded for securities later sold in a short swing transaction, the court will treat the transaction as though the imponderables had been sold for a sufficient amount of cash to buy the securities on the market and the money had been used for that purpose. That was Judge Rifkind's holding in Truncale v. Blumberg, D.C.S.D.N.Y., 88 F.Supp. 677, affirmed on opinion below, Truncale v. Scully, 2 Cir., 182 F.2d 1021. There persons surrendered their employment and bound themselves contractually to work for a corporation whose prospects at that time were far from promising. As part of the deal they received warrants. It would have been theoretically possible to determine what salary would have had to be paid to obtain the services of the employees if the warrants had not been turned over and then to find the cost of the warrants by computing the excess of the hypothetical salary over the salary actually paid. Equating the cost to the market value was so much simpler and more accurate, however, that the court treated the transaction as though the corporation had paid the employees an amount of cash equal to the market price of the warrants and the employees had bought the warrants. Here I am admonished by the Court of Appeals that, though there was no market for the exchanged tangible and intangible assets, I must look to other relevant evidence of the price which a buyer would pay. That is difficult. One of defendant's experts stated that many of the intangibles were of "imponderable" value and that as to many he could not place a dollar amount on them and would not know where to find anyone who could. Finding the price

that a buyer would pay here is certainly more difficult than finding the salary which would have had to be paid in the Truncale case if the warrants had not been turned over to the prospective employees. Thus I feel that I am justified, as an alternative method of determining the cost of the stock, in treating the transaction as if Graham-Paige had paid to Kaiser-Frazer sufficient cash to buy the stock at the market price. Here again, therefore, I infer and find that Graham-Paige paid at least 9⅝ for the stock and that the resale resulted in a loss of at least $445,625.

The ultimate question is not the value of the Kaiser-Frazer stock at the time that it was purchased but the then cost of that stock. Thus far, I have considered two legal theories each of which pointed to the fact that the cost of the stock was the same as its market value and thus to the fact that it was sold at a loss instead of at a profit. I feel that I must check this against the actual value of the property transferred by Graham-Paige as the price of the Kaiser-Frazer stock. Indeed I am directed by the Court of Appeals to make such a valuation.

The cost of the stock to Graham-Paige is not necessarily the same as its market value. Various factors may result in a purchase at more or less than the market value. If the plaintiff in one of these short swing cases should show a purchase for $90,000 and a sale for $100,000 it would not avail the defendant to prove that the market value was really $110,000 at the time of the purchase.

To find the cost of the stock we must value the assets exchanged for the package which included the stock and then apportion the value of the exchanged assets between the stock and the non-stock items in the package.

As a starting point, I take the valuations at which Kaiser-Frazer placed the items on its books in recording the transaction. Kaiser-Frazer is the real party in interest on the plaintiff's side and its books of account can be used against plaintiff as admissions just as plaintiff

used Graham-Paige's books of account as admissions against it to establish plaintiff's prima facie case of profit.

| | | | |
|---|---|---|---|
| "Tangibles" (less trade and sundry accounts payable and accrued expenses assumed by Kaiser-Frazer) | $10,639,579.45 | 750,000 shares of Kaiser-Frazer stock | $ 4,875,000. |
| | | Assumption of payment of debentures | $ 8,524,000. |
| "Intangibles" | 2,759,420.55 | | |
| | $13,399,000.00 | | $13,399,000. |

There follows a simplified statement of the entries made on Kaiser-Frazer's books as shown on Exhibit BB.

■ This represents a receipt of $4,875,000 for 750,000 shares of Kaiser-Frazer stock, or $6.50 a share. Thus if Kaiser-Frazer's books were accepted at their face value there would be an indicated profit of $.25 a share on the 155,000 shares sold at 6¾ or $38,750. Neither plaintiff nor defendant is willing to accept the books at their face value, however. To begin with, although the item for tangibles is as recorded on Kaiser-Frazer's books, plaintiff attacks it on the ground that it represents largely an undivided ⅓ interest in equipment installed in a plant used jointly by Kaiser-Frazer and Graham-Paige or in the plants of suppliers. Plaintiff points out that I have been admonished by the Court of Appeals to find the amount that a hypothetical willing buyer would pay to a hypothetical willing seller and claims that that amount would be far below the cost less depreciation at which it was carried on the books. While I admit the difficulty of judging what price nonexistent parties would trade at if they did exist, I know of no rule to support plaintiff's claim that it would be lower than cost less depreciation where an undivided interest in property used in a going concern was being sold. I regard the book value at which Kaiser-Frazer took the tangible assets into its accounts as "other relevant evidence of the price which a buyer would pay" to which the trier of the facts must look in the absence of a market. See, Stella v. Graham-Paige Motors Corporation, 2 Cir., 232 F.2d 299, 302, footnote 3. I therefore find the value of the tangible assets transferred to have been $10,639,579.45.

That brings me to the intangible assets which were placed on the Kaiser-Frazer books at $2,759,420.55. I do not shut my eyes to the fact that this figure was arrived at by (a) valuing the stock at 6½ on the theory that the market value at the time of the appraisal was 8 and that the net proceeds of a sale of 750,000 shares to the public would not have been more than $6.50 a share, (b) valuing the assumption of payment of the debentures at par or $8,524,000 and (c) subtracting from the total the value of the tangibles. While the book value of the intangibles is thus a balancing figure, it is nevertheless the value placed upon them by Kaiser-Frazer, the real party in interest on the plaintiff's side. I therefore treat that figure as actual for the purposes of this short swing profit case just as I treated Graham-Paige's book figure for the purchase price of the stock as actual although it was only a balancing figure arrived at by deducting the value of the assumption of the debentures at par from the value of the tangibles and, for consistency with income tax treatment, disregarding the intangibles.

Moreover Kaiser-Frazer's book value for the intangibles cannot be regarded as a mere balancing figure. At the meeting of the Board of Directors of Kaiser-Frazer on December 3, 1946, at which the issuance of the stock for assets formally valued at $4,875,000 was approved, Henry J. Kaiser, the Chairman of the Board,

stated that it might be said that the corporation was issuing the stock in exchange for $2,100,000 and the intangible assets. This would put a value of $2,775,000 on the intangibles. The minutes continue,

"The principal consideration, however, of the Board was given to the value of the intangible assets of Graham-Paige Motors Corporation and the actual worth of the 750,000 shares of stock which were to be issued. In regard to the intangibles which the Corporation would receive from Graham-Paige Motors Corporation it was pointed out that the latter corporation since September of 1945 had incurred a cost in excess of $8,000,000 in the development of the automobile business, building up a dealer and distributor organization and making the trade name 'Frazer' known to the public through a national advertising campaign. If the Corporation purchased the automotive assets of Graham-Paige Motors Corporation, it would derive the benefits from the 'going concern value' which had been built up by Graham-Paige Motors Corporation through the expenditure of this sum. Furthermore, under said contract dated September 20, 1946, Graham-Paige Motors Corporation had the right to use one-third of the capacity of the Willow Run Plant which right would be an extremely valuable one as soon as the production of automobiles was such as to enable the operators of the plant to make a profit. Consequently, the so-called intangible property of Graham-Paige Motors Corporation which the Corporation would receive under the proposed purchase of automotive assets had considerable value."

As appears from my earlier opinion in the case, 132 F.Supp. 100, 107–108, defendant produced expert testimony that the intangibles had a value of the order of $10,000,000 and plaintiff adduced no evidence to the contrary.

Again plaintiff says that this intangible property was not salable. I find, however, that it stood precisely like the undivided interest in the tangibles for the purposes of valuation on a hypothetical willing-buyer-willing-seller basis. Following the same reasoning as in the case of the undivided interest in tangibles, I regard Kaiser-Frazer's book value and this expert testimony as "other relevant evidence of the price which a buyer would pay".

I therefore find the value of the intangible assets transferred to have been $2,759,420.55.

The total value of the transferred assets was thus $13,399,000. For these were exchanged the 750,000 shares of stock and the non-stock package items: (a) an agreement by Kaiser-Frazer to pay principal of and future interest on an issue of $8,524,000 of 4% Convertible Debentures of Graham-Paige due April 1, 1956, (b) an agreement by Kaiser-Frazer to pay the interest accrued on said debentures from October 1, 1946, to the closing date, (c) an agreement by Kaiser-Frazer to pay all of the fees of, and disbursements to be incurred by, the trustee and paying agent of said debentures from and after the closing date.

As appears from my earlier opinion, 132 F.Supp. 100, 109, an expert for Graham-Paige appraised this assumption as worthless. On the other hand Graham-Paige, by taking the assumption onto its books at par in recording the transaction, affords admissible evidence of that valuation. We are dealing with something for which there is no market and must therefore hunt elsewhere for evidence of what a hypothetical willing buyer would pay and a hypothetical willing seller would take. This involves " 'a guess by informed persons' ". Westchester County Park Commission v. United States, 2 Cir., 143 F.2d 688, 692. I cannot accept the testimony of Graham-Paige's expert that the assumption was worth nothing. Nor can I accept Graham-Paige's book figure of par. The obligation could not have been worth more than fifty cents on the dollar because, just

after the exchange, the market for the debentures themselves, with the benefit of Kaiser-Frazer's assumption, was only about 50. Indeed during January, 1947, before the assumption became effective, the low bid was 53 and during February, the month during which the assumption became effective, the low bid was 51. I think that the truth lies about midway between Graham-Paige's book par and the expert's zero and I appraise Kaiser-Frazer's obligation at fifty cents on the dollar and find its value to have been $4,262,000.

The next of the non-stock package items is the obligation to pay accrued interest to the date of closing. That obligation would mature on April 1, 1947, instead of nine years thereafter as in the case of principal. While it would thus seem to have been worth par, or $124,299, it does not appear to have been specifically taken into account by Graham-Paige in setting up values upon its books so that we have no specific admission of its value as in the case of the assumption of the debentures. It may have been included in the valuation of the assumption of the debentures at par, however, so I find no admission that it was valueless and accordingly find its value to have been $124,299.

That leaves the last of the non-stock package items, the agreement by Kaiser-Frazer to pay all of the fees and disbursements of the trustee and paying agent of the debentures. Graham-Paige assigned no value to this agreement in recording the transaction. I cannot infer that it may have been included as part of the assumption of payment of the debentures themselves as I did in the case of the agreement to pay accrued interest. There is the evidence, in the form of an admission by defendant Graham-Paige, that the agreement was valueless. I cannot give full credence to that, however. My "informed guess" is that the fees and disbursements would average between $4,000 and $6,000 a year for nine years and that, allowing for Kaiser-Frazer's impaired credit and for discount for future payment, the obligation had a value of $25,000.

To recapitulate, I have found the following values:

| | | | |
|---|---|---|---|
| Tangibles | $10,639,579.45 | Assumption | $4,262,000. |
| Intangibles | 2,759,420.55 | Accrued interest | 124,299. |
| | | Fees & Expenses | 25,000. |
| | $13,399,000.00 | | $4,411,299. |

This means that non-stock items worth $4,411,299 and 750,000 shares of stock cost $13,399,000. To find the cost of the 750,000 shares, the $13,399,000 must be apportioned between the stock and non-stock items. That should be done according to the respective values of the stock and non-stock items. The stock was selling at the time at 9⅝ so that its value was $7,218,750. Adding $4,411,299 as the value of the non-stock items we have a total of $11,630,049. There should thus be assigned to the stock 7,218,750/11,630,049 or 62% of the cost. That amounts to $8,307,380 for 750,000 shares or $11.08 a share. Of this stock, 155,000 shares were sold at $6.75 resulting in a loss of $4.33 a share or $671,150. I find that to be the actual loss incurred by Graham-Paige from the acquisition and sale of 155,000 shares of Kaiser-Frazer stock.

This opinion is intended to embody findings of fact and conclusions of law in addition to those made upon the original hearing. The parties have made specific requests upon this application and I have passed upon them. My several denials are based upon the ground that the finding or conclusion requested was either not established or not relevant.