**Harold KRAMER, Plaintiff,**

**v.**

**William AYER and Itek Corp., Defendants.**

**No. 68 Civ. 2652.**

United States District Court, S. D. New York.

Aug. 3, 1970.

Sidney L. Garwin, New York City, for plaintiff.

Willkie, Farr & Gallagher, New York City, for William Ayer.

Dewey, Ballentine, Bushby, Palmer & Wood, New York City, for Itek Corp.

## OPINION

EDELSTEIN, District Judge.

Plaintiff, a stockholder of Itek Corporation, [Itek] a nominal defendant, brought this action under Section 16(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78p(b) (1964) [1] to recover on behalf of Itek profits allegedly

---

1. § 78p. Directors, officers, and principal stockholders

(b) For the purpose of preventing the unfair use of information which may have been obtained by such beneficial owner, director, or officer by reason of his relationship to the issuer, any profit realized by him from any purchase and sale, or any sale and purchase, of any equity security of such issuer (other than an exempted security) within any period of less than six months, unless such security was ac-quired in good faith in connection with a debt previously contracted, shall inure to and be recoverable by the issuer, irrespective of any intention on the part of such beneficial owner, director, or officer in entering into such transaction of holding the security purchased or of not repurchasing the security sold for a period exceeding six months. Suit to recover such profit may be instituted at law or in equity in any court of competent jurisdiction by the issuer, or by the owner of any

realized by defendant Ayer as a result of various sales by Ayer of shares of Itek common stock within six months after his acquisition of that stock. Ayer has moved for summary judgment, and plaintiff, while cross-moving for summary judgment in his favor, has also moved in the alternative for an order directing trial on the single issue of the amount of recoverable short swing profits allegedly realized by Ayer.

Ayer was the founder, president and a director of Applied Technology, Inc., [ATI], as well as the holder of 169,700 shares of its issued and outstanding common stock, or approximately 15.5 percent of the total. Early in 1967 ATI and Itek entered into merger negotiations which culminated in a public announcement on May 1, 1967, of a proposed merger and an executed written merger agreement dated June 7, 1967. Ayer was one of the principal merger negotiators for ATI.

The merger agreement contemplated a statutory merger of the two corporations with Itek being the surviving corporation. The effective date of the merger was defined by the agreement as the close of business on the date upon which the last of the acts required by the agreement to make the merger complete was performed. On that date each issued and outstanding share of ATI common stock was to become .43 of a share of the common stock of Itek and Ayer was to become an officer and director of Itek.

Actual consummation of the merger was made dependent upon the performance of various stated conditions, such as the approval of the stockholders of each corporation, the exchange of various documents, and compliance with the statutory requirements of California and Delaware, the states of incorporation of ATI and ITEK respectively. While each corporation pledged to make every reasonable effort to comply with and perform the terms and conditions of the agreement, each corporation also had the option of terminating the agreement at any time for any reason. The agreement also provided that prior to the effective date of the merger no rights were conferred by it on anyone other than ATI and Itek.

A specific condition of the merger agreement required the five major stockholders of ATI, including Ayer, to execute and deliver to Itek a "Shareholder Agreement." In this agreement these stockholders warranted, in substance, that they would not sell the Itek stock which they were to receive upon the merger except for such shares as they could sell without registration in conformity with Rule 133 of the Securities and Exchange Commission adopted under the Securities Act of 1933. Ayer alone was required to warrant that in any event he would not sell more than 25 percent of his Itek shares within one year of the effective date of the merger.

Approval of the merger by the stockholders of both corporations was obtained on September 18, 1967. On the next day, September 19, 1967, representatives of ATI and Itek attended a closing where they exchanged the documents specified in the merger agreement. Then, on September 20, 1967, the documents prescribed by state law were filed with the Secretaries of State of California and Delaware. The merger then became complete.

Thereafter, on four separate days within six months of the merger Ayer sold varying amounts of his newly acquired Itek stock. A schedule of these

security of the issuer in the name and in behalf of the issuer if the issuer shall fail or refuse to bring such suit within sixty days after request or shall fail diligently to prosecute the same thereafter; but no such suit shall be brought more than two years after the date such profit was realized. This subsection shall not be construed to cover any transaction where such beneficial owner was not such both at the time of the purchase and sale, or the sale and purchase, of the security involved, or any transaction or transactions which the Commission by rules and regulations may exempt as not comprehended within the purpose of this subsection.

sales appears in the margin.[2] After the first sale was made by Ayer the question of a possible violation of Section 16(b) was raised. Itek and Ayer finally agreed that Ayer would pay to Itek the profits he realized by these sales. These profits were calculated as being $23,777.-80. Ayer paid this amount to the corporation and now claims that he is entitled to summary judgment because whatever liability he may have to Itek has been satisfied. Plaintiff replies that, in fact, Ayer's profits far exceeded the sum paid by him to Itek, and that summary judgment awarding the actual amount of profits earned by Ayer should be entered in favor of plaintiff.

Calculation of the amount of profits earned by Ayer would appear on the surface to be a simple matter, the equation being clear and well established, namely, the net receipts derived from the sales of Ayer's shares less their cost to him. E. g., Park & Tilford, Inc. v. Schulte, 160 F.2d 984, 988 (2d Cir. 1947). There is no dispute as to the net amounts received by Ayer on his sales. The parties sharply disagree, however, as to the proper method of determining the cost to Ayer of the shares sold by him. The $23,777.80 figure relied upon by Ayer was determined by using a cost figure arrived at by multiplying the number of Itek shares sold on each date by 147⅞, the closing price of Itek on the New York Stock Exchange on September 20, 1967.[3] Except for the

sales effected on September 22, 1967, of a total of 9000 shares, Ayer's sales of Itek were made at a price per share less than 147⅞, and thus Ayer claims that he realized a profit only from the sales of September 22, 1967. Plaintiff contends that the cost of the shares sold cannot be determined by looking to the market price of Itek at any time. Instead, the cost of the shares sold must be determined by valuing the ATI shares which were exchanged by Ayer for the Itek shares which he subsequently sold. Several alternative arguments are offered by plaintiff as to the proper method of valuing those ATI shares. Whether Ayer's theory or one of plaintiff's theories is correct and whether summary judgment for either party is proper are the basic issues raised by the cross-motions before the court.

Ayer's theory as to the proper method of determining the cost of the Itek shares sold by him is incorrect because his theory bases the cost of the Itek shares sold solely on the market price of Itek stock on the effective date of the merger. The Itek sold by Ayer, however, was acquired by the exchange of an agreed upon number of shares of ATI; it is the value of those shares of ATI that determines the cost to Ayer of the Itek shares sold by him. Simply stated, for Section 16(b) purposes, in calculating the cost of the stock that was sold, it is the market value of what was given up to obtain that stock that

2.

| Date | Total Shares Sold | Net Amount Received on Sales |
|---|---|---|
| September 22, 1967 | 9000 | $1,354,652.80 |
| February 5, 1968 | 400 | 44,326.18 |
| February 6, 1968 | 600 | 65,051.81 |
| March 7, 1968 | 1000 | 90,261.97 |

3. Actually, it is not clear from the papers submitted by Ayer just what his theory is. The merger agreement provided that on the effective date of the merger each share of ATI was to become .43 of a share of Itek. On September 20, 1967, the date claimed to be the effective date of the merger, Itek closed at 147⅞. Ayer contends that on September 20, 1967, ATI and Itek were "trading equivalents" and that, based on the 147⅞ closing price of Itek, "the equivalent price of ATI was $63.59," that is, .43 of 147⅞. (Plaintiff

argues that in fact ATI never sold at $63.59 on September 20, 1967.) Instead of the method indicated in the text, it may be that Ayer arrived at his cost figure for the Itek shares which he sold by multiplying the number of ATI shares exchanged by him to obtain the number of Itek shares sold by him by $63.59. Whichever method of calculation is used, however, the end mathematical result is the same. And inasmuch as both methods of calculation focus upon the selling price of Itek stock and not upon the value of ATI stock, the court has not deemed it necessary to dwell on these possible alternatives in the text, since, for purposes of the legal issue raised, there is no distinction.

is determinative. *E.g.,* Park & Tilford, Inc. v. Schulte, *supra;* Blau v. Lamb, 242 F.Supp. 151 (S.D.N.Y.1965), aff'd. in part and rev'd. in part 363 F.2d 507 (2d Cir. 1966), cert. denied 385 U.S. 1002, 87 S.Ct. 707, 17 L.Ed.2d 542 (1967); *cf.* Blau v. Mission Corp., 212 F.2d 77 (2d Cir.), cert. denied 347 U.S. 1016, 74 S.Ct. 872, 98 L.Ed. 1138 (1954). To be sure, the market value of what was received may be relevant when other indicia of the value of what was given up are lacking. *See,* B. T. Babbitt, Inc. v. Lachner, 332 F.2d 255, 258 (2d Cir. 1964); Marquette Cement Mfg. Co. v. Andreas, 239 F.Supp. 962 (S.D.N.Y.1965); Stella v. Graham-Paige Motors Corp., 132 F.Supp. 100, 107 (S.D. N.Y.1955), rev'd on other grounds 232 F.2d 299 (2d Cir.), cert. denied 352 U.S. 831, 77 S.Ct. 46, 1 L.Ed.2d .52 (1956). But the question always must be the market value of the property relinquished. Ayer errs because in the first instance he turns to the market value of the property received.

Plaintiff, on the other hand, attempts to determine the market value of the ATI shares used by Ayer to acquire his Itek shares. While focusing on the market value of ATI is both necessary and proper, the analysis which plaintiff offers to the court is deceptively misleading. ATI, according to the plaintiff, was actively traded over the counter. Curiously, though, plaintiff only has submitted to the court bid and asked quotations for the stock. Bid and asked quotations cannot, as plaintiff suggests, especially in an active market, be used blithely as substitutes for market price. Yet plaintiff offers several theories of valuing ATI and each theory relies upon what purports to have been the lowest [4] bid quotation of ATI on the day involved in the particular theory put forth. No justification for this reliance upon the bid and asked quotations instead of upon actual market prices is offered by plaintiff.

Reliance upon the lowest bid quotation for September 20, 1967, the date of the merger,[5] is one alternative theory suggested by plaintiff. However, even though it is the market value of the ATI stock when it was used to acquire the Itek stock sold that is the ultimate issue, plaintiff offers this alternative theory only as a last resort. The amount of the recoverable short swing profits earned by Ayer varies directly, of course, with the cost basis of the Itek shares which he sold. According to plaintiff, the bid and asked quotations for ATI are highest on the dates closest to the date of the merger. For this reason, plaintiff strenuously urges that for the purpose of calculating the recoverable

---

4. Utilizing the lowest market price on a given valuation date is justified by the policy of squeezing out all possible profits from transactions which violate Section 16(b). *See, e. g.,* Smolowe v. Delendo Corp., 136 F.2d 231 (2d Cir.), cert. denied 320 U.S. 751, 64 S.Ct. 56, 88 L. Ed. 446 (1943); Marquette Cement Mfg. Co. v. Andreas, *supra.*

5. The cases under Section 16(b) hold that a purchase occurs when the purchaser becomes irrevocably bound to take the stock in question. *E. g.,* Blau v. Ogsbury, 210 F.2d 426 (2d Cir. 1954); Marquette Cement Mfg. Co. v. Andreas, *supra;* Stella v. Graham-Paige Motors Corp., *supra.* Ayer argues that under the merger agreement he had no right to exchange his ATI shares for Itek shares until the merger was completed. That did not occur until September 20, 1967, when the prescribed documents were filed with the Secretaries of State of California and Dela-

ware. Plaintiff contends that the merger was complete on September 18, 1967, when the stockholders of each corporation gave their approval to the merger, the acts remaining to be performed thereafter being merely ministerial in nature. However this may be, the merger agreement is clear that until all acts necessary for the completion of the merger were performed, either corporation could have cancelled the agreement. Although cancellation may have been unlikely, nevertheless Ayer's rights and obligations as to his Itek stock were not fixed irrevocably until the merger was complete in all respects. The court is persuaded that Ayer's purchase of his Itek shares occurred on September 20, 1967. *Accord,* Lang and Katz, Liability for "Short Swing" Trading in Corporate Reorganizations, 20 Sw. L.J. 472 (1966), reprinted A.B.A., Selected Articles on Federal Securities Law 679 (1968).

profits earned by Ayer, the market value of ATI should be derived from the bid and asked quotations of that stock on April 28, 1967, the last business day before the public announcement of the proposed merger.

While plaintiff argues that once the news of the impending merger was made public the market price of ATI no longer was determined "by the normal economic factors such as profits, sales, assets, liabilities, etc., but rather by consideration of monetary benefit to be derived from the merger," he does not urge that the bid and asked quotations of September 20 be disregarded because there is any evidence of market fraud or manipulation. Nor does plaintiff intimate that the September 20 market for ATI was not sufficiently active so as to provide a proper reflection of value. On the contrary, plaintiff contends that the market in ATI was at all times an active one. The essential rationale of plaintiff's argument is that Section 16 (b) is a remedial statute designed to deter corporate insiders from taking unfair advantage of information not available to ordinary investors. And to maximize the deterrent effect of this section, in the oft-quoted language of Smolowe v. Delendo Corp., 136 F.2d 231, 239 (2d Cir.), cert. denied 320 U.S. 751, 64 S.Ct. 56 (1943), it is necessary to " * * * squeeze all possible profits out of [proscribed] stock transactions. * * * " The only way in which this can be accomplished here, and the only way in which Ayer can be prevented from taking advantage of his violation, plaintiff argues, is by excluding from the market value of ATI any increment in price traceable to the merger. Plaintiff concludes that the bid and asked quotations for April 28, 1967, are the last ones which were " * * * unadulterated by public knowledge of the proposed merger; " hence these quotations should be relied upon here.[6]

In Park & Tilford, Inc. v. Schulte, *supra*, reliable market prices were unavailable and the court therefore relied upon a stipulation as to the value of the preferred stock in issue there. Plaintiff attempts to extend the *Park & Tilford* case by arguing, as an alternative theory to the above, that Ayer, by his own actions has "agreed" at various times that the market value of his ATI stock should be derived from market quotations on dates other than September 20, 1967. First, by reaching an oral agreement of merger with Itek on behalf of ATI by the end of April 1967, wherein an exchange ratio was agreed upon, Ayer is said to have agreed that the value of his ATI stock should be derived from the bid and asked quotations of April 28, 1967. Second, by signing on June 7, 1967, the shareholder's agreement required by the merger agreement, Ayer is said to have obligated himself not to exchange his ATI shares except pursuant to the merger. This, plaintiff contends, means that Ayer agreed that the maximum cost basis of his ATI shares was no greater than the low bid quotation on June 7. Finally, on August 16, 1967, Ayer, as President of ATI, sent proxies to the stockholders of ATI soliciting their approval of the merger. In the proxy statement the value of the Itek shares which Ayer would receive pursuant to the merger was given on the basis of the market price of Itek as of July 1, 1967. Plaintiff concludes from this that Ayer agreed that his ATI shares were worth .43 of the July 1, 1967, market price of Itek.

The various approaches urged upon the court by plaintiff raise interesting legal problems. For purposes of the motions before the court, however, the crucial point to be made is that whichever approach is accepted, all present issues of material fact which cannot be resolved without a trial.

Assuming for the moment that the policy of Section 16(b), albeit never applied in quite the manner urged by plaintiff, requires that any increment in market price traceable to the merger be excluded from the valuation of Ayer's

6. Plaintiff also offers other arguments in support of his position; these arguments need not be reached for purposes of this motion.

ATI stock, how much of the increase in price from April 28, 1967, to September 20, 1967, was caused by the news of the merger? Plaintiff assumes that all of the alleged increase in the bid and asked quotations for ATI was caused by the merger announcement. It is entirely possible, however, that factors other than the news of the merger played a role in the purported increase of the bid and asked quotations of ATI. Indeed, it is a fact of market experience that the factors which produce market fluctuations are so variable and numerous and many-faceted as almost to elude analysis. To what extent any factors other than the news of the merger were present and had an effect here the court cannot say. The question, though, must be answered, if plaintiff's theory is accepted.

More importantly, and as already indicated, throughout his argument plaintiff consistently confuses bid and asked quotations with market prices and uses these terms interchangeably, ignoring thereby the essential differences which exist between bid and asked quotations and market prices. Bid and asked quotations are not market prices. They do not represent actual transactions whereas market prices are derived only from actual sales of shares of stock. At the very best bid and asked quotations are nothing more than offers to buy and offers to sell. And sometimes these offers to buy and to sell are not firm so that very often it cannot even be said that a stock necessarily can be sold at the bid figure or be bought at the asking figure. These facts are not unknown to market participants; the court can only guess at why plaintiff has confused the issue in the manner that he has. Indeed, at the bottom of the very report of the National Quotations Bureau submitted by plaintiff it says that "The above quotations represent prices between dealers and do not include retail mark-up, mark-down or commission. They do not represent actual transactions, and have not been adjusted for stock dividends or splits." What the market price of ATI on a particular date was is another material factual issue that must be explored at trial.

It requires no citation to say that where there are genuine issues of material fact a motion for summary judgment cannot be granted.

Thus far the court has considered the cross-motions before it just as they relate to the issue of the amount of recoverable profits realized by Ayer. Plaintiff, though, has moved in the alternative for summary judgment as to liability alone together with an order directing a trial limited to the issue of the amount of recoverable profits. The issue of liability, that is, whether Ayer's acquisition of his shares of Itek pursuant to the merger is a purchase within the meaning of Section 16(b) [7] neither has been briefed nor argued by the parties. While Ayer may have assumed liability on his part for purposes of his motion for summary judgment, there is no clear-cut all-purpose concession of liability in his papers. Moreover, whether a particular transaction involving the exchange of shares of one corporation for shares of a second corporation is one to which Section 16(b) applies is a question which requires an analysis of all of the circumstances surrounding the transaction. See, Newmark v. RKO General, Inc., 425 F.2d 348 (2d Cir. 1970); Blau v. Lamb, supra; Blau v. Mission Corp., supra; Lang and Katz, Liability for "Short Swing" Trading in Corporate Reorganizations, supra, note 5. With the record before the court devoid of argument on the liability issue, with the possibility that an exploration of this issue will reveal even more triable issues of fact, and since a trial will be necessary in any event, the court deems it best to deny too the alternative relief sought by plaintiff.

The motions of the parties are denied in all respects.

So ordered.

---

7. Ayer's status as an insider appears to be clear. See 15 U.S.C. § 78p(a) (1964).